[J-90-2016] [MO: Saylor, C.J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

| | | |
|---|---|---|
| MICHAEL C. DUFFEY, | : | No. 4 MAP 2016 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 1840 CD |
| | : | 2014 dated June 26, 2015 Affirming the |
| v. | : | decision of the Workers' Compensation |
| | : | Appeal Board at Nos. A13-0229 and |
| | : | A13-1158 dated September 16, 2014. |
| WORKERS' COMPENSATION APPEAL | : | |
| BOARD (TROLA-DYNE, INC.), | : | ARGUED: September 14, 2016 |
| | : | |
| Appellees | : | |

**DISSENTING OPINION**

**JUSTICE WECHT** **DECIDED: January 19, 2017**

Subsection 306(a.2) of the Workers' Compensation Act provides that impairment-rating physicians shall "determine the degree of impairment due to the compensable injury." 77 P.S. § 511.2(1). The learned Majority construes this to mean that physicians must assess all of the claimant's injuries, including those that the claimant's employer never accepted as compensable. The Majority arrives at this interpretation by disregarding the statutory definition of the word "impairment." Because the Majority's reading of Subsection 306(a.2) will compromise the impairment-rating process, which exists to quantify a claimant's whole body impairment due to his established work-related injuries, I respectfully dissent.

The issue that Duffey presents is narrow: Does an amendment that expands the injury description on a notice of compensation payable ("NCP") invalidate an impairment rating evaluation ("IRE") that was conducted before the amendment? Trola-Dyne

maintains that it does not, arguing instead that claimants must file a petition to amend the NCP before the IRE occurs. In the event that a claimant fails to seek an amendment prior to the IRE, Trola-Dyne notes, the claimant still may contest the change to partial disability status "at any time during the five hundred week period of partial disability," 77 P.S. § 511.2(4), by petitioning the WJC to amend the NCP and then obtaining an impairment rating of at least fifty percent. Brief for Trola-Dyne at 23. Duffey, on the other hand, argues that allowing post-IRE amendments to invalidate an already-completed IRE would not impose much of a burden on employers, who can simply require that the claimant submit to another IRE. Brief for Duffey at 18.

The Majority adopts neither party's position. Under the Majority's approach, claimants in Duffey's position need not file a petition to amend the NCP at all. This is so, the Majority reasons, because impairment-rating physicians have a duty to identify any injuries that are "fairly attributable" to the claimant's compensable injury. To be sure, the fact that Duffey himself has not advanced the Majority's reading of Subsection 306(a.2) does not mean that the issue is "waived" or otherwise beyond the scope of our review. Maj. Op. at 13-15. It is notable, however, that the interpretation which the Majority deems "straightforward" was not championed by Duffey, his *Amicus*, Trola-Dyne, the Commonwealth Court, the Appeal Board, or the WCJ. Moreover, to my knowledge, no judicial or administrative tribunal expressed such an understanding of Subsection 306(a.2) throughout the two decades since Act 57 became effective.

The Majority's principal misstep is that it mislabels Duffey's psychological conditions, both of which are injuries in their own right,[1] as "impairments" that the IRE

---

[1] This Court consistently has held that the term "injury" encompasses "any hurtful or damaging effect which may be suffered by anyone." Panyko v. W.C.A.B. (U.S. Airways), 888 A.2d 724, 735 (Pa. 2005) (citing Creighan v. Firemen's Relief & Pension Fund Bd., 155 A.2d 844, 847 (Pa. 1959)).

physician must diagnose and evaluate. Notably absent from the Majority's analysis is the fact that the Act defines "impairment" as "an anatomic or functional abnormality or loss that results from the compensable injury and is reasonably presumed to be permanent." 77 P.S. § 511.2(8)(i). Similarly, the Majority's thorough review of the *AMA Guides to the Evaluation of Permanent Impairment* ("the *Guides*") fails to recognize that the AMA defines "impairment" as "a significant deviation, loss, or loss of use of any body structure or body function in an individual with a health condition, disorder, or disease."[2] AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 5 (6th ed. 2008). Under both definitions, losses could be anatomic (like amputation) or functional (like decreased range of motion or an inability to perform activities of daily living). As these definitions suggest, the purpose of an IRE is to determine whether the compensable injury has left the claimant with a permanent "loss," and, if so, to quantify it. Put differently, impairment ratings quantify losses and limitations, not diseases and disorders.

Notwithstanding its repeated insistence that its holding flows from the plain language of Section 306(a.2),[3] the Majority fails to elucidate the principle which can transform the statutory phrase "the degree of impairment due to the compensable injury" into the unconfined styling "the degree of impairment due to injuries not yet determined to be compensable." With today's decision, the Majority by judicial fiat

---

[2] The *Guides* and the Act also define an "impairment rating" using similar language. See AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 5 (6th ed. 2008) (describing an impairment rating as a "consensus-derived percentage estimate of loss of activity reflecting severity for a given health condition, and the degree of associated limitations in terms of ADLs [(Activities of Daily Living)]"); 77 P.S. § 511.2(8)(ii) ("[T]he term 'impairment rating' shall mean the percentage of permanent impairment of the whole body resulting from the compensable injury.").

[3] See Maj. Op. at 7, 10, 13 n.12, 15 n.15, 16, 17, 18.

converts the statute's impairment-rating process into one in which physicians must scrutinize each "condition" hinted at by a claimant, and then determine which, if any, are "fairly attributable" to the compensable injury.[4] Maj. Op. at 10. The Majority justifies this remodeling by citing a few nonspecific passages from the *Guides*. But, when deciding whether a particular malady is causally related to a claimant's work injury, the *Guides* are no more helpful to physicians than a copy of *Moby-Dick*. As the Majority correctly notes, the *Guides* are simply a "tool to translate human pathology resulting from a trauma or disease process into a percentage of the whole person." Maj. Op. at 8.

The Majority invokes the mandate (which no one disputes) that impairment-rating physicians must determine the degree of "whole-body" or "whole-person" impairment. Id. at 8, 10, 12 n.10, 13, 14, n.14, 15. However, the Majority misconstrues the concept of "whole-body" impairment to mean that impairment-rating physicians must go beyond the scope of the claimant's compensable injury. See id. at 12 n.10 (stating that whole-body impairment "obviously encompasses the brain and functioning"); 15 (concluding that the General Assembly "intended to require a physician to render a detailed whole-person evaluation").

The requirement that impairment ratings be expressed in terms of "the percentage of permanent impairment of the whole body," 77 P.S. § 511.2, exists because the *Guides'* formulae differ across the various organ systems. Some chapters, like those relating to the musculoskeletal system, yield "regional" ratings, which must be converted into a whole-person rating. The complete loss of a hand, for instance, is

---

[4]  Although the record in this case demonstrates that Duffey informed Dr. Sicilia about his mental health issues, the Majority's holding logically would apply even if Duffey had remained silent. This is so because the statute provides simply that "[t]he degree of impairment shall be determined based upon an evaluation by a physician . . . pursuant to the most recent edition of the [*Guides*]." 77 P.S. § 511.2(1).

equivalent to 90% upper-extremity impairment, while the complete loss of an upper extremity is equivalent to 60% whole-person impairment. AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 22 (6th ed. 2008). In light of these hierarchical impairment schedules, the "whole-body" requirement serves two important purposes. First, it ensures consistent impairment ratings across different organ systems, and second, it guarantees that a claimant's total impairment rating will not exceed 100%. Id. at 21-22.

Chapter 14 of the *Guides*, which relates to mental and behavioral disorders, also provides no support for the Majority's holding. As the Majority notes, the *Guides* "rather pointedly discourage separate treatment of psychological effects." Maj. Op. at 11. Specifically, physicians are to use Chapter 14: (1) if a mental or behavioral disorder is present without a physical impairment;[5] (2) if a mental or behavioral disorder "*is judged independently compensable by the jurisdiction involved*;" or (3) when explicitly required by a particular state's compensation system. AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 349 (6th ed. 2008) (emphasis in original). As with Subsection 306(a.2), these directives plainly contemplate that the scope of an IRE will be constrained by the "compensable injury." Id.; 77 P.S. § 511.2(1) (providing that impairment-rating physicians shall "determine the degree of impairment due to the compensable injury"). Thus, the Majority errs in opining that "it devolves to the physician-evaluator's sound professional judgment whether, and under what circumstances, psychological conditions effectively graduate to distinct consideration per the *Guides*' mental-and-behavioral-disorders protocols." Maj. Op. at 12.

---

[5] See generally Payes v. W.C.A.B. (State Police), 79 A.3d 543 (Pa. 2013) (discussing so-called "mental-mental" injuries).

Even if the Sixth Edition of the *Guides* supported the Majority's statutory interpretation, I find it impossible to ignore the proverbial elephant-in-the-room that is Protz v. W.C.A.B. (Derry Area School Dist.), 124 A.3d 406 (Pa. Cmwlth. 2015), *appeal granted*, 133 A.3d 733 (Pa. 2016), in which the Commonwealth Court held that Subsection 306(a.2) constitutes an unconstitutional delegation of the General Assembly's legislative authority.[6] Notably, that decision required that impairment-rating physicians use the **Fourth** Edition of the Guides. Protz, 124 A.3d at 416. Yet, the Majority's interpretation is driven, in part, by portions of the **Sixth** Edition that were not present in earlier versions. See Maj. Op. at 10-12 (discussing Chapter 14 of the *Guides*, relating to "Mental and Behavioral Disorders").

Setting aside the substantive legal issues in Protz, the appeal of which is currently pending before this Court, I see two problems with the Majority's use of the *Guides* to interpret Subsection 306(a.2). First, as a conceptual matter, I fail to discern why this Court should, or even how it could, divine the legislative intent of Subsection 306(a.2) by looking at a publication that the AMA released more than a decade after the General Assembly enacted the statute. To make matters worse, the Fourth Edition of the *Guides*—the most recent version in existence when the General Assembly enacted Subsection 306(a.2) in 1996—categorically rejects the use of impairment percentages in the context of mental disorders, and contains no formula for calculating them. AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 300 (4th ed. 1993) (explaining that there "is no available empiric [*sic*] evidence to support any method for

---

[6] It may be true that Duffey did not challenge the use of the Sixth Edition in this appeal, but the Majority's interpretation of Subsection 306(a.2) presumably does not apply only to Duffey. See Maj. Op. at 7 ("Per [the] express terms [of Subsection 306(a.2),] a physician-evaluator must consider and determine causality in terms of whether any particular impairment is 'due to' the compensable injury.").

assigning a percentage of impairment" to mental or behavioral disorders); id. at 301 (embracing the view that, "unlike the situations with some organ systems, there are no precise measures of impairment in mental disorders").[7]

Because it is likely that the Majority would interpret Subsection 306(a.2) differently if it relies upon the Fourth Edition of the *Guides*, I cannot agree that <u>Protz</u> has no bearing upon this case. Even a cursory review of the Majority's analysis reveals that its decision today is rooted in the text of the *Guides* as much or more than it is grounded in the text of the statute. <u>See</u> <u>e.g.</u>, Maj. Op. at 8, 10, 11-12. In other words, the Majority extensively relies upon the Sixth Edition of the *Guides*, even though current precedent holds that the Sixth Edition plays no role in the IRE process. My point here is not to suggest that the issue Duffey presents is not "important in its own right;" it is to propose that the manner in which the Majority resolves the issue disregards an important overarching inquiry. <u>Id.</u> at 20.

Equally troubling, the Majority relieves claimants of their burden of proving a causal relationship between the accepted work-related injury and any subsequently

---

[7] That the Fourth Edition of the *Guides* eschews the practice of assigning impairment percentages in the context of mental disorders is not open to serious debate. In that publication, the AMA, in no uncertain terms, took the position that there is no evidence "to support any method for assigning a percentage of impairment" to mental or behavioral disorders. AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 300 (4th ed. 1993). It is of no moment that the State of Maine's Workers' Compensation Act allows physicians to rate such impairments using criteria that were intended to be used for other purposes. Maj. Op. at 19 (citing <u>Harvey v. H.C. Price Co.</u>, 957 A.2d 960 (Me. 2008)). Once more, the problem with the Majority's analysis is that it is predicated upon the Sixth Edition of the *Guides* (the adoption of which the Commonwealth Court has held unconstitutional) despite the undeniable fact that the Sixth Edition differs dramatically from the Fourth Edition, particularly in the context of mental disorders. The prospect that this Court, if presented with a challenge to the absence of certain impairment-rating criteria in the Fourth Edition, might apply a layer of judicial gloss on top of the AMA's handiwork does not make the Majority's statutory interpretation any less problematic.

arising psychological injuries. On this subject, the Act makes clear that, when an employer accepts liability for purely physical injuries, the claimant bears the burden of proving the necessary causal relationship. See 77 P.S. § 772 (providing that a WCJ "may, at any time, modify, reinstate, suspend, or terminate a notice of compensation payable . . . upon proof that the disability of an injured employe [*sic*] has increased, decreased, recurred, or has temporarily or finally ceased").

In Commercial Credit Claims v. W.C.A.B. (Lancaster), 728 A.2d 902 (Pa. 1999), a claimant was injured when he fell from a catwalk. The employer issued a NCP in which it voluntarily accepted liability for physical injuries that it described as "cervical syndrome, sprain[ed] right sternoclavicular joint." Id. at 903. Three years later, the employer sought to terminate the claimant's benefits, alleging that he had fully recovered from the work-related injury. The WCJ denied the employer's termination petition, noting that the employer's own medical expert had raised the possibility that the claimant was suffering from a psychological condition due to his initial work injury.

On appeal, we held that the WCJ erred in failing to confine his analysis to the injuries listed on the NCP. We emphasized that the claimant's psychological injury "plainly fell outside the scope of liability to which the employer had stipulated in the [NCP] because it was an entirely different type of injury, distinct in kind from" the claimant's physical injuries. Id. at 905 n.5. Thus, "because claimant never sought to modify the terms of the [NCP] to include compensation for his mental injuries, employer needed to show only that claimant's physical injuries had been resolved in order to succeed on its termination petition." Id. at 905.

Although Commercial Credit Claims involved a termination petition rather than an IRE, the underlying rationale is equally applicable here. Our decision was based upon Section 407 of the Act, which provides that a NCP is "valid and binding unless modified

or set aside," as well as Subsection 413(a), which states that a WCJ may modify a NCP "upon proof that the disability of the injured employe [*sic*] has increased, decreased, [or] recurred." 77 P.S. §§ 731, 772. Though the Majority claims otherwise, neither of these provisions is limited to the Act's "modification and termination schemes." Maj. Op. at 15 n.15. Furthermore, the Majority's decision is at odds with our holding in Commercial Credit Claims insofar as the Majority refuses to acknowledge that Duffey's late-manifesting psychological conditions are separate injuries, "distinct in kind from the [physical] injury described in the [NCP]." Commercial Credit Claims, 728 A.2d at 905 n.5.

Evidently, Duffey understands that the NCP's injury description is binding unless modified or set aside, because he sought to amend the NCP to include his PTSD and adjustment disorder with depressed mood. The WCJ then held hearings, considered the deposition testimony of multiple physicians, made credibility determinations, and ultimately concluded that Duffey's additional injuries should be added to the NCP. According to the Majority, all of this was unnecessary; instead, the impairment-rating physician unilaterally should have discerned the scope of Duffey's compensable injury. Or, to use the Majority's words, the impairment-rating physician should have determined whether "any particular impairment" was due to the compensable injury, a phrase that may or may not be synonymous with the compensable injury itself. Maj. Op. at 7, 14 (referring to injuries and impairments as "overlapping and intersecting—but also diverging—concepts"). The Majority insists that this is nothing out of the ordinary, since WCJs typically rely upon medical experts in other contexts. In my view, however, a physician who proceeds according to his or her own assessment is not a substitute for a WCJ who first evaluates conflicting expert testimony and then reaches a reasoned

decision.[8]  The Majority's approval of the former marks a significant departure from both the statutory language and current practice.[9]

I also find puzzling the Majority's citation to a Department of Labor and Industry regulation, which instructs that, "when the evaluating physician determines that the compensable injury incorporates more than one pathology, the evaluating physician may refer the employee to one or more physicians specializing in the specific pathologies which constitute the compensable injury." 34 Pa. Code § 123.105(b).  If anything, the above regulation suggests that the Department of Labor and Industry, unlike the Majority, believes that impairment ratings should include only the "pathologies which constitute **the compensable injury**." Id. (emphasis added).  Despite the Majority's concession that a NCP defines the compensable injury and that the NCP in this case did not include Duffey's psychological injuries, it somehow concludes that Dr.

---

[8]    Imagine a situation where a claimant, during an IRE, mentions that he is experiencing a litany of psychiatric symptoms.  Although the NCP describes the compensable injury as a spinal injury, the physician—perhaps having read the Majority's decision—finds that the claimant is suffering from PTSD, which he believes is fairly attributable to the claimant's work injury.  After evaluating the claimant's physical and mental injuries, the physician concludes that the claimant has a fifty-percent impairment rating.  This scenario is problematic because the issue of causation should be for the WCJ to decide, not the physician.  See 77 P.S. § 772 (providing that the WCJ may modify a NCP upon proof that a claimant's disability has increased).

Furthermore, assuming that the employer could somehow challenge the physician's determination, the employer would need to prove the absence of a causal relationship between the compensable injury and the subsequently arising psychological injury.  In other words, the employer would be forced to prove a negative. See Commercial Credit Claims, 728 A.2d at 905 (declining to "strain the humanitarian goals underlying the [Act]" by requiring employers to disprove a causal relationship between the physical injuries described in the NCP and a subsequently alleged psychological injury).

[9]    It is also inconsistent with the *Guides*, which state that "an impairment evaluation is a form of expert testimony." AM. MED. ASS'N, GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT 27 (6th ed. 2008).

Sicilia should have referred Duffey for an assessment of those injuries. Maj. Op. at 1-2, 8.

Finally, the Majority justifies its holding by noting that employers sometimes describe injuries "briefly and even cryptically" on NCPs. I share the Majority's worry that such practices are not rare and that they might enure to a claimant's detriment. See generally DAVID B. TORREY & ANDREW E. GREENBERG, 8 WEST'S PA. PRACTICE SERIES, WORKERS' COMPENSATION: LAW AND PRACTICE, § 20:63 (3rd ed. 2008) ("Unfortunately, the integrity of the 'description of injury' can be impacted either by sloppy or perfunctory claims handling or by intentional though unwarranted efforts to limit employer liability."). The NCP here, for example, described Duffey's injury as "stripping some electrical wire." See Notice of Compensation Payable, 3/23/2009, at 1. It may well be that in situations like these, where the NCP lacks needed specificity, we should interpret it in the light most favorable to the claimant, who, after all, did not draft it. See e.g., Cerro Metal Products Co. v. W.C.A.B. (PLEWA), 855 A.2d 932, 938 (Pa. Cmwlth. 2004) (construing broadly an injury described in the NCP as "chemical fume exposure" because employer failed to "specify the physical injury," instead describing "the manner in which it was acquired"). The Majority does not create such a rule here. It offers an authoritative interpretation of the Act, presumably applicable even when the NCP is a model of perfect clarity and precision.

The Majority's interpretation of Section 306(a.2), one which neither party has advanced and which the plain language does not support, will fundamentally alter the IRE process. It will relieve claimants of their burden to prove compensable injuries and turn impairment-rating physicians into junior varsity WCJs. The likely result will be heightened confusion and increased litigation. I respectfully dissent.