**CERRO METAL PRODUCTS COMPANY and Engle–Hambright & Davies, Inc., Petitioners**

v.

**WORKERS' COMPENSATION APPEAL BOARD (PLEWA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 18, 2004.

Decided Aug. 5, 2004.

Michael J. Wagner and Tracy Myers–Dumm, Altoona, for petitioners.

David B. Consiglio, State College, for respondent.

BEFORE: PELLEGRINI, Judge, COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN.

Cerro Metal Products Company (Employer) and Engle–Hambright & Davies, Inc., its insurance carrier, appeal a decision of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ) denying a termination petition Employer had filed against Francis Plewa (Claimant). On appeal we are asked to determine: 1) whether the expert medical testimony that the WCJ relied upon is incompetent as a matter of law and 2) whether the Board, on appeal, expanded the description of Claimant's injury and,

in doing so, misapplied the burden of proof.

Claimant was employed as a welder, when, on August 11, 2000, he inhaled noxious chemical fumes (nickel and chromium) in the workplace. His injury, for which he received total disability benefits, was described in a notice of compensation payable (NCP), as "chemical fume exposure" (Finding of Fact (FOF) 1.) On December 22, 2000, Employer filed a termination petition alleging that Claimant had fully recovered from his work injury as of December 13, 2000 and was able to return to work without restrictions. Claimant filed an answer denying these allegations and contended that he continued to be disabled from the inhalation injury, which caused pulmonary, cognitive and neurological problems. Among the symptoms to which Claimant testified were chronic coughing, dizziness, lightheadedness, memory problems, daytime fatigue and amplified hearing. The WCJ found Claimant credible.[1] He also found that Claimant was no longer able to work overtime hours, that he spent a lot of time in bed due to lightheadedness, and that he becomes overwhelmed performing simple tasks, such as mowing the lawn or going to the store.

The parties presented expert testimony of pulmonary specialists and neurologists, as well as that of other medical and scientific experts. The Court will first discuss the testimony of the pulmonary specialists, then the neurologists, and then the other experts.

Because this is a termination petition, Employer has the burden of proof,[2] and, therefore, submitted the May 10, 2001 deposition testimony of George M. Zlupko, M.D, who is board-certified in internal medicine and limits his practice to pulmonary disease. This witness stated that when he examined Claimant, Claimant did not exhibit evidence of significant shortness of breath or pulmonary difficulties, that his chest x-ray was normal and that his pulmonary function studies revealed "normal flow, normal lung volumes and a mildly reduced diffusing capacity." (FOF 19.) He further stated that the reduced diffusing capacity was a laboratory abnormality to which he would attribute no cause and for which he would impose no restrictions. (FOF 20.) He then opined that Claimant had fully recovered from the inhalation injury. On cross-examination, Dr. Zlupko admitted that he did not know the amount of fumes which Claimant had inhaled, a factor relevant to determining the effects of occupational exposure.

In opposition, Claimant presented the June 8, 2001 deposition testimony of John J. Solic, M.D., a board-certified internist and pulmonologist. This witness opined that Claimant continued to be disabled due to his pulmonary problems. He diagnosed Claimant with "reactive airways disease syndrome," which related directly to his August 11th inhalation injury. (FOF 26.) He indicated that he would not release Claimant to return to work unless he passed a Methacholine Challenge Test and he had not given Claimant such a test since Claimant's treating neurologist had not yet released him to return to work from a neurological standpoint. *Id.* (Deposition of Dr. Solic, pp. 13, 24.) Dr. Solic also stated that Claimant is not fully recovered from his work injury and may suffer

---

1. Claimant's condition also required a ten-day hospital stay and caused him to experience high blood pressure for the first time.

2. In a termination petition Employer bears the burden of proving that the claimant's work-related disability has ceased. *Pistella v. Workmen's Compensation Appeal Board (Samson Buick Body Shop),* 159 Pa.Cmwlth.342, 633 A.2d 230 (1993).

recurrent symptoms if he returns to work and is exposed to fumes. The WCJ accepted as more credible the testimony of Dr. Solic over that of Dr. Zlupko. (FOF 50.)

Employer and Claimant each presented medical testimony of neurology specialists. Employer presented Richard B. Kasdan, M.D., a board-certified neurologist. This witness stated that, upon clinical examination, the only abnormal finding he noted was Claimant's slowness in answering questions. He ordered an EEG and the result of that test was normal. In his opinion there was no objective data to support the idea of a neurological problem involving Claimant's central nervous system.

Claimant presented the deposition of Emile P. Roy, III, M.D., a board-certified neurologist. He noted that Claimant complained of intermittent headaches, dizziness, light-headedness, problems with balance, fatigue, difficulty concentrating and increased sensitivity of hearing. The doctor's clinical examination did not reveal any obvious neurological defects, although he did observe that Claimant's balance was off. He ordered 1) an MRI of the brain, which revealed that Claimant's brain was "essentially normal," 2) a carotid ultrasound, which showed no significant narrowing, and 3) an electronystagmography,[3] which indicated a "mild vestibular abnormality on the right."[4] (FOF 29.)

Dr. Roy stated on cross-examination that he had reviewed the results of psychological testing performed on Claimant by Lisa Young, Ph.D., a licensed psychologist practicing in the specialty of neuropsychol-

ogy, which specialty involves assessing brain functioning through cognitive tests. Dr. Young testified that on the Weschler Adult Intelligence Scale (WAIS), Claimant indicated a "significant decline in the performance subtest which is consistent with a change in [his] functioning ability." (FOF 34.) Claimant also performed poorly on memory tests, when those results were compared to his score on the WAIS. *Id.* Dr. Young further stated that research done on chemical exposure and its effect on the brain indicates that the frontal lobes area is the most susceptible to tissue damage and that Claimant's pattern of impairment was consistent with functions carried on in that area, including concentration, attention and executive functioning. (FOF 35.) According to Dr. Roy, Dr. Young's testing objectively documented Claimant's problems in the areas of concentration and memory loss. Dr. Roy also accepted Dr. Young's conclusion that Claimant's lack of concentration and his memory deficits related to traumatic brain injury. Based on his own examination, which revealed no other etiological basis for Claimant's neurological symptoms, and the tests performed by Dr. Young, Dr. Roy opined that Claimant's symptoms were related to the inhalation incident, that he had not fully recovered from the work-related injury and that he could not return to his pre-injury job. (Deposition of Dr. Roy, pp. 13–15.) The WCJ credited Dr. Roy's testimony over that of Dr. Kasdan. (FOF 50.)

Employer also presented the testimony of Donald McGraw, M.D., a board-certified occupational medicine specialist. This expert, who reviewed Claimant's medical rec-

---

**3.** Electronystagmography is "the recording of changes in the corneo-retinal potential due to eye movements providing objective documentation of induced and spontaneous nystagmus." Dorland's Illustrated Medical Dictionary 577 (29th ed.2000).

**4.** A vestibule is "a space or cavity at the entrance to a canal." Dorland's Illustrated Medical Dictionary 1962 (29th ed.2000).

ords, stated that the term "metal fume fever is used to describe a set of acute transient symptoms of temporary overexposure to metals used in the welding and braising industry." (FOF 41.) Symptoms of this condition include runny nose, tearing eyes, a transient cough, nausea, headaches and dizziness. *Id.* Dr. McGraw also stated that nickel and chromium are rapidly excreted from the body. His opinion was that, although nickel and chromium can affect the lungs, and possibly the kidneys if there is long-term exposure, these chemicals do not attack the central nervous system. He, thus, concluded that Claimant's difficulties with dizziness, balance, headaches, memory and concentration are not related to the August 11th incident.

Claimant, in response, submitted the deposition of Ayusman Sen, Ph.D., a Doctor of Chemistry and a Professor at Penn State University. This witness postulated that metals in the body can be transported to the brain and that there is documentary evidence that nickel carbonyl[5] can cause brain hemorrhaging.

Subsequently, Dr. McGraw was again deposed. In his later deposition he disagreed with Dr. Sen that nickel can cause brain hemorrhaging, indicating that it is not mentioned in the "foremost text" on neurotoxicology and that, if such neurotoxilogical problems existed with nickel, such fact would have been observed in nickel mining. (FOF 45.) The WCJ accepted

the findings of Dr. McGraw over those of Dr. Sen on this disputed point and, thus, concluded that nickel exposure does not cause brain hemorrhaging. (FOF 49.)

In summary, the WCJ found the opinions of Claimant's doctors, Solic, Roy and Young more credible than those of Drs. Zlupko, Kasdan, Sen. (FOF 50.) He credited the testimony of Dr. McGraw in part.[6] He also specifically stated, "I accept Dr. Solic's analysis that absent a Methacholine Challenge Test he could not rule out his working diagnosis of reactive airway disease syndrome." (FOF 50.) Further, he credited the opinion of Dr. Roy, as supported by that of Dr. Young, that "Claimant's reaction to the inhalation incident of August 11, 2000 is a substantial contributing factor to his complaints of headaches, dizziness, light-headedness, balance problems, fatigue and cognitive impairment." *Id.* The WCJ further observed that even Drs. Kardan and Zlupko believed Claimant's complaints were genuine, and stated only that they could find no objective evidence of neurological or pulmonary impairment. *Id.*

Based on these findings, the WCJ denied the termination petition and Employer appealed to the Board, which affirmed. Employer now appeals to this Court.[7]

■ On appeal, Employer argues first that Dr. Roy's testimony is legally incompetent because there is a lack of scientific support for his conclusions that the inhala-

---

5. It is unclear whether Claimant was exposed to nickel carbonyl, as opposed to nickel, and what the distinctions, might be.

6. With regard to Dr. McGraw, the WCJ wrote, "To the extent that my finding accepting as credible Dr. McGraw's explanation of the effects of nickel and chromium on the body seems inconsistent with the foregoing credibility findings, I find that Dr. Roy viewed the toxicity of chromium and/or nickel as one

possible contributing factor, not the sole contributing factor." (FOF 50.)

7. Our scope of review where, as here, both parties have presented evidence is limited to whether the findings of fact are supported by substantial evidence and whether there has been any constitutional violation or legal error. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa. Cmwlth.436, 550 A.2d 1364 (1988).

tion incident was a substantial contributing factor to his complaints. Employer is correct that a WCJ can not accept "fiction at the expense of factual reality." (Brief at 13, citing *Condran v. Workers' Compensation Appeal Board (H.B. Reese Candy Co.)*, 721 A.2d 1133 (Pa.Cmwlth.1998), *petition for allowance of appeal denied*, 560 Pa. 750, 747 A.2d 371 (1999). However, that did not occur here. The first example Employer provides of where Dr. Roy's testimony is legally incompetent is his deposition where Dr. Roy admitted that there is nothing in the medical literature to connect Claimant's chemical exposure to his vestibular abnormality. (Deposition of Dr. Roy, pp. 29–31, 33–37.) Dr. Roy did state that exposure to toxins, such as the chemicals involved here, "could" cause a vestibular abnormality. Taken in context, this statement appears to be equivocal. However, Dr. Roy also opined that Claimant's inhalation accident was a substantial contributing factor to his neurological symptoms (although not to his vestibular abnormality) and that his opinion was based on medical literature that he had reviewed. That packet of information was made part of the evidentiary record. (Claimant's Exhibit 11; Board Adjudication p. 6.) This evidence contained scientific support for Dr. Roy's position that neurological symptoms, including headache, weakness, coughing, peripheral nervous system effects, vertigo, and visual disturbances, can occur due to exposure to chemicals such as the ones involved here. This data was from such agencies as OSHA, the National Institute of Health, the Environmental Protection Agency and the National Library of Medicine. Moreover, Dr. Roy *also* stated that he had *additional* bases for his medical opinion that Claimant's neurological symptoms were caused by his exposure to the nickel and chromium. Those additional bases were Claimant's medical "history," and the lack of any oth-

er medical explanation for his symptoms. (Deposition of Dr. Roy, p. 32.) The question is whether this evidence, *in toto*, is competent as a matter of law.

 Although it is solely the role of the WCJ to assess credibility and resolve conflicts in the evidence, *Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152 (Pa. Cmwlth.1998), the question of the competency of the evidence is one of law and fully subject to our review. *Cramer v. Workmen's Compensation Appeal Board (Uni–Marts & PMA Group)*, 156 Pa. Cmwlth.266, 627 A.2d 231, 233 (1993). "Competency when applied to medical evidence, is merely a question of whether the witnesses' opinion is sufficiently definite and unequivocal to render it admissible." *Id.* We have often observed that medical evidence is unequivocal as long as the medical expert, after providing a foundation, testifies that in his professional opinion he believes or thinks the facts exist. *See, e.g., Philadelphia College of Osteopathic Medicine v. Workmen's Compensation Appeal Board (Lucas)*, 77 Pa.Cmwlth. 202, 465 A.2d 132 (1983). Even if the witness admits to uncertainty, reservation, doubt or lack of information with respect to scientific or medical details, as long as the witness does not recant the opinion first expressed, the evidence in unequivocal. *Id.*

In this case, Dr. Roy, at no time, recanted his medical opinion on causation. Moreover, he gave cogent reasons for his medical viewpoint and proffered scientific literature in support of it. Further, in his deposition, Dr. Roy clearly stated that Claimant's symptoms were caused by his inhalation accident, that the symptoms continue to exist and that Claimant could not return to work. (Deposition of Dr. Roy, pp. 14–15.) We, thus, hold that his

testimony was not incompetent as a matter of law.

■ Employer next argues that the Board, in seeking to justify what Employer characterizes as the expansion of Claimant's description of the injury, misapplied the burden of proof by requiring it to prove that Claimant's exposure was *not* sufficient to cause the additional symptoms, rather than requiring Claimant to show that it was.[8] It relies on, *inter alia, Commercial Credit Claims v. Workers' Compensation Appeal Board (Lancaster)*, 556 Pa. 325, 728 A.2d 902 (1999), in which the Court placed the burden on the employee to prove a causal relationship between a subsequently alleged psychiatric injury, where the employer had accepted liability in the NCP only for physical injuries.

Claimant, in response, relies on a different Supreme Court opinion, which held that the employer who seeks to terminate benefits has the burden to prove that the current disability is not related to or was not caused by the work-related injury as described in the NCP. *Gumro v. Workmen's Compensation Appeal Board (Emerald Mines Corporation)*, 533 Pa. 461, 466–467, 626 A.2d 94, 97 (1993).

In order to determine whether the employer or claimant has the burden of proof, both of these cases focus on the relationship between the injury for which the claimant seeks benefits and the injuries described in the NCP. The claimant had the burden of proof in *Commercial Credit*, because "the injury for which the employee sought benefits was an injury which plainly fell outside the scope of liability to which the employer had stipulated in the Notice of Compensation Payable because it was an entirely different type of injury, distinct in kind from the injury described in the Notice of Compensation Payable." *Commercial Credit*, 556 at 333 n. 5, 728 A.2d at 905 n. 5.[9] In contrast, however, the employer had the burden of proof in *Gumro*, because the injuries for which the employee sought benefits were very similar to those in the NCP.

Therefore, we must examine the injury described in the NCP. In this case, the WCJ found that the injury was described in the NCP as "chemical fume exposure."[10] However, this description does not specify the physical *injury*, but instead the manner in which it was acquired. The Workers' Compensation Act[11] places responsibility for completing the NCP upon the employer. In fact, an employee is not even required to sign the form. 34 Pa. Code § 121.7(c). A fair reading of the description provides coverage for any physical injuries caused by the chemical fume exposure. Moreover, the credited expert testimony indicates that there is a causal link between the neurological symptoms and the chemical fume exposure. Thus, we conclude that the WCJ and Board did not improperly expand Claim-

---

8. Claimant contends that this issue was not preserved below. However, Employer is alleging that the *Board* misapplied the burden (an error of law); therefore, there would be no method to have preserved it below.

9. The Court explained that the claimant's subsequently alleged psychiatric injuries could have formed the predicate for compensation under the Act only if the NCP was, first, properly modified to reflect the employer's increased liability for these distinct injuries.

10. Our review here is hampered by the fact that the December 22, 2000 NCP was not certified to this Court as part of the record. Thus, we rely on the WCJ's finding that the injury was described as "chemical fume exposure." (FOF 1.)

11. Section 407 of the Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 731.

ant's injury beyond the NCP or impose an improper burden on Employer to show the chemical exposure was too minimal to cause the additional symptoms. Accordingly, there was no shift in the burden of proof and Employer cannot prevail on that issue.

Because we conclude that Dr. Roy's expert testimony was not incompetent as a matter of law, that there was no expansion of the description of the injury and, consequently, no improper shift of the burden of proof, the order of the Board is affirmed.

### ORDER

**NOW,** August 5, 2004, the order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby affirmed.