IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pocono Medical Center and   :
Qual-Lynx, Inc.,       :
      Petitioners  :
           : No. 698 C.D. 2018
    v.        :
           : Submitted: October 26, 2018
Workers' Compensation Appeal  :
Board (Berry),       :
      Respondent  :


BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge


***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH        FILED: January 9, 2019


    Pocono Medical Center (Employer) petitions for review from the April 19, 2018 order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ), which granted the review and reinstatement petitions of John Berry (Claimant).


## Background

    Claimant began working for Employer in 1993 and, as of December 2014, held the job title of "grounds." (WCJ's Findings of Fact (F.F.) Nos. 1, 3.) As part of Claimant's job duties, he was responsible for the upkeep of Employer's 26-acre

grounds and for maintaining vehicles. *Id.* Claimant was injured on December 9, 2014, when he was removing a bag of salt out of the back of a truck and tripped on an entrance way and twisted his back. *Id.* Claimant immediately felt sharp pain in his lower back and down his leg. *Id.*

Following the injury, Claimant began receiving workers' compensation (WC) benefits pursuant to a medical only Notice of Compensation Payable that described Claimant's work injury as a "lumbar strain." (F.F. No. 1.) On March 17, 2016, Claimant filed review and reinstatement petitions.[1] In particular, Claimant sought to amend the description of his December 9, 2014 work injury to include aggravation of preexisting degenerative disease. Claimant also alleged that he became totally disabled on July 3, 2015. Employer filed answers denying the material allegations. The WCJ conducted a hearing on April 17, 2016.

At the hearing, Claimant testified that after his injury he returned to light-duty work and was then able to return to his regular full-duty job. (F.F. No. 4.) While Claimant admitted that he did not experience any symptoms when he first returned to full-duty work, he testified that his condition gradually got worse and that his lower back became more aggravated as he worked. *Id.* Specifically, Claimant's toes tingled, felt numb, and fell asleep, and his lower back was sore and painful when he would get home at night. *Id.* Claimant further explained that he experienced lower back pain at his belt line and on his left side. *Id.* Claimant's symptoms were similar to those that he experienced on the date of the work-related incident in December 2014. *Id.*

Claimant's last day of work was June 30, 2015. (F.F. No. 6.) On that date, Claimant was still performing his normal "grounds" job duties. *Id.* Claimant

---

[1] Because Claimant never received disability benefits for his December 2014 work injury prior to filing a reinstatement petition, it appears that it would have been more appropriate for Claimant to have filed a claim petition.

testified that he did not go to work on July 1, 2015, because "his left leg had cramped up like [a] big charley horse and his lower back was sore." *Id.* Claimant stated that he could not move his leg after waking up on July 1, 2015, so he took the day off. *Id.* Claimant visited his primary care physician on July 1, 2015, who referred him to Mountain Valley Orthopedics. (F.F. No. 7.)

Claimant acknowledged that he had experienced lower back problems for 10 to 12 years and that he had received shots/epidurals and prescriptions. (F.F. No. 8.) However, Claimant testified that he was not under the care of any doctor for lower back complaints in December 2014, and that no doctor had recommended back surgery prior to his December 2014 work injury. *Id.*

Claimant presented the deposition of Dr. Allister Williams, with whom he treated following the December 2014 injury. (F.F. No. 9.) Dr. Williams testified that he began treating Claimant on July 15, 2015, but that he had also treated Claimant in his practice prior to July 15, 2015. *Id.* In fact, Claimant visited Dr. Williams' practice for his December 9, 2014 injury on December 10, 2014, when he was seen by physician's assistant (PA) Anthony Blundetto. On December 10, 2014, Claimant informed PA Blundetto that he was experiencing lower back and left lower extremity paresthesia due to tripping on a sidewalk at work on December 9, 2014. *Id.* Upon examination, PA Blundetto noted that Claimant had decreased sensation to light touch in the left L5 dermatome, but that Claimant otherwise had normal sensation. *Id.* PA Blundetto released Claimant to modified duty with no pushing, pulling, bending, or twisting. *Id.*

Dr. Williams testified that Claimant visited PA Blundetto again on December 18, 2014, at which time Claimant cancelled a previously scheduled MRI, noting that his left thigh and leg pain had diminished and that he wished to return to

full-duty work. (F.F. No. 10.) Nearly seven months later, Claimant visited PA Blundetto on July 8, 2015, and reported that he was again experiencing left lower extremity radiculopathy. *Id.* At that time, Claimant was taking Mobic, Tramadol, and Valium for his symptoms. *Id.* At the July 8, 2015 visit, Claimant reported that his pain had worsened over the past four weeks. *Id.* Claimant denied any right lower extremity complaints. *Id.*

PA Blundetto performed a physical examination on Claimant and found that Claimant had a positive straight leg raise on the left, but negative on the right. *Id.* PA Blundetto also reported that Claimant had normal sensation to light touch and a normal gait. *Id.* PA Blundetto restricted Claimant from work until the next follow-up visit. *Id.* Claimant followed up with PA Blundetto on July 13, 2015. *Id.* At that visit, PA Blundetto noted that Claimant continued to complain of left lower extremity radiculopathy and that Claimant's condition remained unchanged. *Id.* PA Blundetto also noted that an MRI report revealed there was stenosis at L3-L4 and moderate L5-S1 disc protrusion with possible disc extrusion. *Id.*

Dr. Williams saw Claimant on July 15, 2015, at which time he obtained a history from Claimant. (F.F. No. 11.) Claimant reported that he had been experiencing back pain since December 2014, but that it had recently worsened, and that he also had pain on his left side. *Id.* Claimant underwent an MRI of his lumbar spine on July 9, 2015 and Dr. Williams reviewed the films. (F.F. No. 12.) Dr. Williams testified that the MRI revealed foraminal stenosis at L4-L5 and L5-S1 on the right side and right lateral recess stenosis over L4. *Id.* Dr. Williams testified that those changes were degenerative in nature. *Id.*

Dr. Williams testified that upon physical examination, Claimant had a negative straight leg raised bilateral and that both knee jerk and ankle jerk reflexes were

plus two symmetric. (F.F. No. 13.) Dr. Williams also reported that Claimant had decreased sensation and weakness in his left tiabilis anterior, which was scored 4/5. *Id.* Dr. Williams noted that he reviewed the MRI report and that the radiologist had interpreted the disc herniation at L5-S1 as a disc extrusion, but that it was anterior. (F.F. No. 14.) *Id.* Dr. Williams testified that this was significant because anterior means it is towards the abdomen so it is not causing compression in the nerve root located at L5-S1. *Id.* However, Dr. Williams concluded that Claimant's symptoms closely resembled an L4-L5 nerve root impingement. *Id.* Dr. Williams noted that nerve root impingement does not always follow the defined pattern that is described in medical literature. *Id.*

Dr. Williams testified that Claimant had spinal stenosis because of a disc collapse, known as foraminal stenosis and, therefore, he recommended a multi-level fusion. (F.F. No. 15.) On September 8, 2015, Claimant underwent surgery, particularly an interspinous fusion at L3-L4 with a left hemilaminectomy at L3-L4. *Id.* Dr. Williams testified that based on a follow-up visit conducted after the surgery, Claimant's radiculopathy had completely resolved but that Claimant still experienced mild lower back pain. *Id.* Dr. Williams determined that Claimant had degenerative changes in the lumbar spine and that the most significant change was stenosis at L3-L4. (F.F. No. 16.) Because Claimant became symptomatic after tripping, Dr. Williams concluded that Claimant sustained an aggravation of his preexisting L3-L4 spinal stenosis. *Id.* Dr. Williams testified that Claimant's surgery was necessitated by his December 2014 work injury. *Id.*

Employer offered the testimony of Dr. Neil Kahanovitz, who is board certified in orthopedic surgery. (F.F. No. 17.) Dr. Kahanovitz performed an independent medical evaluation (IME) on Claimant on August 12, 2016, at which time

5

he received a history from Claimant regarding his December 9, 2014 work injury and his subsequent medical treatment. *Id.* Dr. Kahanovitz noted that Claimant worked modified duty for approximately 7-10 days, but then returned to full-duty work until July 2015. *Id.* At the time of the IME, Claimant was not taking any medication, but was participating in physical therapy and a chiropractic program twice a week. *Id.* During the IME, Claimant reported that he had long-standing back and left radicular symptoms that dated back to 2002, which would periodically flare up, and that his symptoms had been treated with physical therapy, epidural and steroid injections, and medication over the years. *Id.* After examining Claimant, Dr. Kahanovitz concluded there was minimal pain to palpation in the midline and left-sided paraspinal muscles between the L4 and the sacrum. (F.F. No. 18.) He also found that Claimant did not experience right-side pain to palpation or radiation in his lower extremities. *Id.* Dr. Kahanovitz's neurological examination revealed normal motor/strength testing in Claimant's lower extremities on both legs, and that sensation was normal throughout Claimant's dermatomes in both legs and his deep tendon reflexes. *Id.* Dr. Kahanovitz also found that Claimant had a negative straight leg raising, bowstring, and Lasegue, with referred back pain only occurring at 90 degrees on the left. *Id.* Dr. Kahanovitz also noted that no radicular pain was elicited. *Id.*

Dr. Kahanovitz testified that based on Mountain Valley Orthopedics' records, dated December 18, 2014, Claimant was released to return to full-duty work without restrictions. (F.F. No. 19.) Dr. Kahanovitz reviewed Claimant's medical records, the medical records of Dr. Li, a neurosurgeon with whom Claimant previously treated for back problems, and the July 2015 MRI report. (F.F. No. 20.) Dr. Kahanovitz concluded that the MRI report revealed long-standing degenerative changes with secondary stenosis. *Id.* He testified that he did not observe any evidence

6

of an acute abnormality such as a disc herniation, but rather, only long-standing stenotic changes. *Id.* Dr. Kahanovitz noted that a previous MRI from 2010 revealed similar degenerative changes beginning at L3 and extending throughout the lower three lumbar levels. *Id.* He explained that there appeared to be a progression of degenerative changes between 2010 and 2015. *Id.*

Dr. Kahanovitz concluded that Claimant most likely sustained a lumbar strain or possibly an aggravation of lumbar degenerative disc disease, but that Claimant fully recovered based on his history within 10 days to 2 weeks of the injury. (F.F. No. 21.) Dr. Kahanovitz noted that Claimant returned to full-duty work without restrictions and without having received treatment, and continued to do so until July 2015, roughly seven months later. *Id.* Dr. Kahanovitz testified that based on his review of Claimant's records, Dr. Williams' opinion that Claimant sustained an aggravation of his preexisting condition that required Claimant to have surgery many months after the work injury did not make sense. (F.F. No. 22.) Dr. Kahanovitz opined that if Claimant had sustained an aggravation of his preexisting condition on December 9, 2014, he would have continued to be symptomatic. *Id.* Dr. Kahanovitz also indicated that there was no evidence of an acute abnormality on the MRI that would indicate any acute structural change. *Id.* Dr. Kahanovitz further explained that in instances where a patient sustains an acute injury or aggravation that necessitates symptoms six to seven months later, one would expect those symptoms to continue and be symptomatic to a significant degree. *Id.* Because Claimant's symptoms did not significantly continue or progress from mid-December 2014 through July 2015, Dr. Kahanovitz determined that Claimant's surgery was not related to his December 9, 2014 injury. (F.F. No. 23.) Dr. Kahanovitz noted that there were no medical records demonstrating that Claimant complained of symptoms during the seven-month period following his injury. *Id.*

Dr. Kahanovitz testified that he reviewed medical records from 2010 in which Claimant described to Dr. Li that he was suffering from back and left lower extremity pain. (F.F. No. 24.) Dr. Kahanovitz concluded that as of August 12, 2016, Claimant had fully recovered from the lumbar strain that he sustained on December 9, 2014, and that Claimant did not need further medical treatment. (F.F. No. 25.)

Claimant offered the rebuttal testimony of Dr. Robert Mauthe, who is board certified in physical medicine and rehabilitation. (F.F. No. 26.) Dr. Mauthe performed an IME on December 9, 2015. *Id.* In his report, Dr. Mauthe explained that it was his opinion that Claimant suffered a lumbar strain during the course of his employment on December 9, 2014. (F.F. No. 29.) The report also noted that Dr. Williams had concluded that Claimant's need for surgery was a direct result of the December 9, 2014 injury. *Id.* Dr. Mauthe testified in his deposition that he agreed with his diagnosis of a lumbar strain, but concluded that Dr. Williams did not perform surgery on Claimant for a lumbar strain because fusion surgeries are done for lumbar intervertebral disc syndromes or degenerative disc disease. (F.F. No. 27.) Although Dr. Mauthe noted a diagnosis of lumbar strain in his report, he testified in his deposition that the surgery was done for the aggravation of the degenerative disc disease. (R.R. at 26a.)

The WCJ concluded that Claimant's testimony was credible based on Claimant's bearing and demeanor at the hearing. (F.F. No. 31.) The WCJ noted that although Claimant acknowledged his 10-to 12-year preexisting condition, Claimant critically testified that he was not under the care of any doctor for lower back pain in December 2014. *Id.* The WCJ found it particularly significant that there was no evidence that Claimant received treatment for his back between 2011 and the time of his injury. *Id.* While Claimant had previously underwent MRIs for his back, the last

8

one he underwent prior to his work injury was in 2011. *Id.* The WCJ further noted that although Dr. Williams saw Claimant in 2011, there was no evidence that Claimant was treating with a physician in 2014. *Id.*

The WCJ explained that Claimant suffered a specific incident, which was acknowledged and undisputed by Employer. *Id.* The WCJ noted that Claimant had worked light duty for approximately 10 days, during which his symptoms subsided, but once Claimant returned to full duty without restrictions, the same symptoms he experienced in December 2014 returned. *Id.* The WCJ found it significant that Claimant described a recurrence of the symptoms once he returned to his full-duty position without restrictions. *Id.* The WCJ determined that although Claimant did not receive treatment immediately, Claimant's symptoms progressively worsened by working his full-duty job because of the physical demands of the job. *Id.* The WCJ found that Claimant's credibility was bolstered by the fact that he had initially attempted to work through the injury, rather than receive treatment. *Id.*

The WCJ also explained that he found the testimony of Dr. Williams more credible than that of Dr. Kahanovitz. (F.F. No. 32.) The WCJ noted that Dr. Williams was Claimant's treating doctor and performed his surgery, and that Dr. Williams treated Claimant both before and after the December 2014 work injury, which was significant in light of the medical questions at issue. *Id.* In contrast, the WCJ found that Dr. Kahanovitz only examined Claimant on one occasion. *Id.* Further, while Dr. Kahanovitz placed significant weight on the fact that Claimant worked modified duty for only 10 days and then performed his pre-injury job for about seven months, the WCJ accepted Claimant's testimony that his symptoms returned once he began working his full-duty job. *Id.* Specifically, the WCJ credited Claimant's testimony that his pain subsided when he was not required to do anything strenuous, but that the

9

pain returned and progressively worsened when he began lifting, bending, and kneeling and working without restrictions. *Id.* The WCJ also noted that there had been no intervening incident following the December 2014 injury except for Claimant's work activities. *Id.* The WCJ held, "[e]mployers take their employees as they come and while Claimant did have a pre-existing condition, he was not experiencing those complaints when he tripped and twisted his back." *Id.* The WCJ concluded that Dr. Williams' opinion that Claimant aggravated his preexisting condition, which caused his pain to return, was logical and consistent and, therefore, rejected the opinion of Dr. Kahanovitz to the extent it was inconsistent with Dr. Williams' opinion. *Id.* The WCJ, however, placed no value on Dr. Mauthe's deposition because his opinions were solely based on Dr. Williams' opinions. (F.F. No. 37.)

Based on these credibility determinations, the WCJ concluded that Claimant met his burden and granted his reinstatement and review petitions. (F.F. No. 33.) The WCJ reinstated Claimant's temporary total disability benefits as of July 8, 2015, with ongoing total disability benefits at the rate of $506.65 per week. *Id.* The WCJ also amended Claimant's December 2014 work injury to include "aggravation of his pre-existing L3-L4 spinal stenosis; status post interspinous fusion at L3-4 with a left hemilaminectomy at L3-4." (F.F. No. 34.)

Employer appealed the July 21, 2017 decision and order of the WCJ to the Board. On April 19, 2018, the Board affirmed the WCJ's decision and order.

10

## Discussion

Employer now petitions this Court for review of the Board's order,[2] raising a single issue: whether the testimony of Claimant's medical expert was incompetent as a matter of law. Employer argues that Dr. Williams' testimony was incompetent because he had an incomplete history of Claimant's lower back problems and was unaware of the extent to which Claimant had suffered lower back problems before the December 2014 work injury. Additionally, Employer maintains that Dr. Williams' testimony was incompetent because he did not review the film from Claimant's 2010 MRI; did not know when Claimant's back pain started; did not review any medical records from Claimant's family doctor; did not review Claimant's medical records from when he treated with Dr. Li, a neurosurgeon; and testified that other than the lower back pain that most people generally experience, Claimant did not have any back problems or symptoms before the December 2014 work injury. Further, Employer impugns Dr. Williams for not discussing in his deposition a separate work-related lower back injury that Claimant sustained in 2002, and for not discussing a 2006 MRI that Claimant received. Employer also argues that Dr. Williams' opinion was incompetent because he did not compare Claimant's pre-injury MRIs with his post-injury MRI.

Citing to *Chik-Fil-A v. Workers' Compensation Appeal Board (Mollick)*, 792 A.2d 678, 689 (Pa. Cmwlth. 2002), in which we held that an expert's testimony is incompetent where it is based on an incomplete and inaccurate medical history,

---

[2] Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer)*, 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

11

Employer argues that Dr. Williams' testimony was incompetent because Dr. Williams had incomplete and inaccurate information regarding Claimant's prior lower back problems. Employer further claims that Dr. Williams never demonstrated that there was a worsening of Claimant's preexisting back problems after the December 2014 injury and did not explain why Claimant did not receive any medical treatment for his work injury during the seven-month period between December 2014 and July 2015.

Although the WCJ has exclusive province over questions of credibility and evidentiary weight, "the question of the competency of the evidence is one of law and fully subject to our review." *Cerro Metal Products Co. v. Workers' Compensation Appeal Board (Plewa)*, 855 A.2d 932, 937 (Pa. Cmwlth. 2004). It is well-established that "[c]ompetency when applied to medical evidence, is merely a question of whether the [witness's] opinion is sufficiently definite and unequivocal to render it admissible." *Id.* "[M]edical evidence is unequivocal as long as the medical expert, after providing a foundation, testifies that in his professional opinion he believes or thinks the facts exist." *Id.*; *see also Andracki v. Workmen's Compensation Appeal Board (Allied Eastern States Maintenance)*, 508 A.2d 624, 627 n.5 (Pa. Cmwlth. 1986) (noting that unequivocal medical testimony requires the medical witness to do more than testify that the claimant's conditions or symptoms might have been or probably were the result of the claimant's work). Further, "[e]ven if the witness admits to uncertainty, reservation, doubt or lack of information with respect to scientific or medical details, as long as the witness does not recant the opinion first expressed, the evidence is unequivocal." *Cerro Metal Products*, 855 A.2d at 937. Additionally, "the fact that a medical expert does not have all of a claimant's medical records goes to the weight given the expert's testimony, not its competency." *Samson Paper Co. & Fidelity Engraving v. Workers' Compensation Appeal Board (Digiannantonio)*, 834 A.2d 1221,

12

1224 (Pa. Cmwlth. 2003); *see also Calex, Inc. v. Workers' Compensation Appeal Board (Vantaggi)*, 968 A.2d 822, 827 (Pa. Cmwlth. 2009) (same); *Degraw v. Workers' Compensation Appeal Board (Redner's Warehouse Markets, Inc.)*, 926 A.2d 997, 1001-02 & n.4 (Pa. Cmwlth. 2007) (same).

Employer relies on *Chik-Fil-A* to argue that Dr. Williams' testimony was incompetent because he relied on incomplete and inaccurate information. In *Chik-Fil-A*, the claimant had sustained a work-related injury in a separate incident two years before the work injury for which she sought WC benefits. 792 A.2d 678. On cross-examination, the claimant's doctor testified that he assumed the history the claimant gave him was accurate regarding the current work incident and also any complaints or injuries she had of a similar nature prior to the work incident. *Id.* at 682. The doctor admitted, however, that if the claimant's history was not complete or accurate, his opinion would not be valid and he would have to reevaluate it. *Id.* He also admitted that although the claimant had included her earlier work injury in her patient history, he did not review any of her treatment records for that injury. *Id.* at 683. We held that because the doctor testified that "if the claimant's medical history had not been as she indicated his evaluation would be incorrect," and the doctor "had no knowledge of [the claimant's] prior relevant medical history and treatment, or any previous diagnostic test results," his testimony that the work incident caused the claimant's injuries was incompetent, as a matter of law. *Id.* at 689.

*Chik-Fil-A* demonstrates that when a doctor is completely oblivious to a claimant's prior medical history and presents equivocal testimony, it may render a doctor's testimony incompetent. However, in *Pryor v. Workers' Compensation Appeal Board (Colin Service Systems)*, 923 A.2d 1197 (Pa. Cmwlth. 2006), we explained that "a medical expert's opinion is not rendered incompetent *unless it is based solely* on

13

inaccurate information." *Id.* at 1203 (emphasis added). We further noted that "'[t]he fact that a medical expert does not have all of a claimant's medical records goes to the weight given the expert's testimony, not its competency.'" *Id.* (quoting *Marriott Corp. v. Workers' Compensation Appeal Board (Knechtel)*, 837 A.2d 623, 631 n.10 (Pa. Cmwlth. 2003)). Moreover, in *American Contracting Enterprises, Inc. v. Workers' Compensation Appeal Board (Hurley)*, 789 A.2d 391 (Pa. Cmwlth. 2001), we similarly held that "[a] medical expert's opinion is not rendered incompetent unless it is *solely* based on inaccurate or false information." *Id.* at 396 (emphasis in original). We also explained that "the opinion of a medical expert must be viewed *as a whole*, and that inaccurate information will not defeat that opinion unless it is dependent on those accuracies." *Id.* (emphasis in original).

Here, the crux of Employer's argument is that Dr. Williams' testimony was not competent because he did not fully review, or was not fully aware of, Claimant's complete medical history. In particular, Employer criticizes Dr. Williams for not reviewing all of Claimant's previous MRIs, and for not having knowledge of a previous work injury that occurred 12 years before the work injury at issue in this case. Employer also contends Dr. Williams' testimony was not competent because he testified that Claimant had "significant degenerative changes in the lumbar spine like any working person has," which, according to Employer, ignored the existence of Claimant's earlier back problems and 2002 work-related injury. After a review of Dr. Williams' testimony, however, we disagree.

In his deposition, Dr. Williams testified that he first saw Claimant relative to the December 9, 2014 work injury on July 15, 2015. (Reproduced Record (R.R.) at 51a.) Dr. Williams noted that Claimant had been treated by his practice before then, and was seen by PA Blundetto the day after the injury on December 10, 2014. *Id.*

14

According to Claimant's medical records from that time, Claimant complained of "left lower back extremity paresthesia[, which] began on December 9 when he tripped on a sidewalk at work while carrying a 50 pound bag of ice melt." (R.R. at 51a-52a.) Claimant visited Dr. Williams' office again on December 18, 2014 for an MRI, but because his pain had lessened by that time he cancelled the MRI and returned to full-duty work. (R.R. at 53a.)

Claimant next visited Dr. Williams' practice on July 8, 2015. *Id.* At that visit, Claimant complained of "left lower extremity radiculopathy, and he noted that he had this since in December." (R.R. at 54a.) Claimant complained about his pain worsening over the previous four weeks. (R.R. at 55a.) At a follow-up visit on July 13, 2015, Claimant again complained of left lower extremity radiculopathy, and the MRI report indicated "stenosis at L3-L4, and moderate L5-S1 disk [sic] protrusion, with possible disk [sic] extrusion." *Id.* Claimant visited with Dr. Williams on July 15, 2015, at which time Dr. Williams took Claimant's medical history. (R.R. at 56a.) Claimant told Dr. Williams that he had been having back pain since December 2014, but that it had recently worsened.[3] *Id.* At that visit, Dr. Williams recommended surgery and Claimant underwent an interspinous fusion surgery on September 8, 2015. (R.R. at 59a-60a.)

Based upon the history that Claimant reported, Dr. Williams' review of Claimant's file, and his own evaluation of Claimant, Dr. Williams made the following conclusion in his deposition regarding Claimant's injury:

---

[3] This statement was supported by Claimant's own testimony. In particular, Claimant testified that his symptoms worsened after he returned to full-duty work and that eventually his back became so aggravated he had to stop working because of the symptoms. (R.R. at 19a-20a.) He also testified that although he was not experiencing symptoms when he first returned to full-time work, the pain gradually and progressively increased. (R.R. at 37a-38a.)

15

A: Well for me it's relatively straightforward. He's a gentleman who has significant degenerative changes in the lumbar spine like any working person has. And I believe the changes that are most significant in this situation is [sic] a stenosis at L3-L4. He basically tripped at work while carrying a heavy bag, twisted and then became symptomatic. So I would describe that as an aggravation of his pre-existing L3-L4 spinal stenosis. He doesn't have this beforehand, before this injury, and he's basically complained about it since. There was obviously a period where he felt a little bit better, but the symptoms were always present to some extent. And people do work with pain. You know, when you're a hard-working person you work with pain. And eventually he couldn't continue, and he decided to have surgery. . . .

Q: And, doctor, do you have an opinion as to whether the surgery you performed was necessitated by the December 2014 work injury?

A: Yes, I do believe that it was causally related to the work injury.

(R.R. at 63a-64a.) Dr. Williams was next asked about Claimant's prior back problems:

Q: Doctor, did [Claimant] testify about the fact that he had prior back complaints?

A: Yes. He was seen back in 2011.

Q: By this office?

A: Yes.

Q: Was that by you?

A: Yes, it was by me.

Q: And what were the complaints that he had at that time?

. . .

16

> A: Essentially what happened to him at that time, he had surgery for—he had a hospitalization for diverticulitis, and he was in bed for several days. Then after—after that he started to have back pain. And then he came in to see me. I saw him, it had resolved, and I didn't see him again for years.

(R.R. at 65a-66a.) Dr. Williams testified that his opinions had been made "within a reasonable degree of medical certainty." (R.R. at 66a.)

On cross-examination, Dr. Williams was asked about Claimant's previous complaints of lower back pain and testified as follows:

> Q: Okay. But your testimony today is that [Claimant] never had these symptoms or these problems before this work injury?
>
> A: That he didn't have any problems that I knew of before this work injury, besides the general low back pain that people have. *But he did complain of low back pain in the past.*
>
> Q: And you knew—you at least knew he had an MRI in the past before this work injury?
>
> A: Oh, sure, yeah.

(R.R. at 67a) (emphasis added).

On cross-examination, Dr. Williams also discussed two of Claimant's MRIs, dating to 2010, that were in Claimant's chart and which Dr. Williams believed had been obtained when he treated Claimant in 2011. (R.R. at 67a-69a). While Dr. Williams could not remember whether he had reviewed the actual 2010 MRI films, he testified that he had reviewed the reports. (R.R. at 67a-68a.) Finally, with regard to Dr. Williams' understanding of the nature of Claimant's prior back problems, Dr. Williams testified, as follows:

17

Q: Okay. But your only understanding of the back problems that he had before this work injury was the brief visit that he had with you after the diverticulitis and he had some low back problems that went away?

A: Or he didn't need to come back for it.[4]

(R.R. at 70a.)

Based on our review of Dr. Williams' deposition transcript, we conclude his testimony was competent as a matter of law. First, Dr. Williams' opinion was "sufficiently definite and unequivocal to render it admissible." *Cerro Metal Products*, 855 A.2d at 937. Dr. Williams testified that Claimant's work injury aggravated his preexisting L3-L4 stenosis, that Claimant was asymptomatic before the work injury but had progressively worsening back pain after the incident, and that Claimant's surgery was necessitated by the work injury. (R.R. at 63a-64a.) On cross-examination, Dr. Williams did not waiver in his opinion that the work injury caused Claimant's most recent back issues. Accordingly, Dr. Williams' testimony was sufficiently unequivocal.

Second, while Dr. Williams did not review all of Claimant's medical records, when Dr. Williams' opinion is "viewed as a whole," it was clearly not "solely based on inaccurate or false information." *American Contracting Enterprises*, 789 A.2d at 396. Here, Dr. Williams admitted that he did not know when Claimant's lower back pain started; that he did not review Claimant's records from Claimant's family practice doctor; that he did not review Claimant's records from when he treated with Dr. Mark Li; and that he did not compare the 2010 MRIs with the 2015 MRI. (R.R. at 68a, 71a-73a) Although Dr. Williams did not review all of Claimant's prior medical

---

[4] Claimant, in fact, testified that he had experienced lower back problems for 10 to 12 years, but that at the time of his 2014 injury he was not under the care of or seeing a doctor for lower back complaints. (R.R. at 25a-26a.)

18

records, including several MRIs, and thus might not have understood the full extent of Claimant's previous lower back problems, Dr. Williams clearly had knowledge of Claimant's history of back issues. Specifically, Dr. Williams reviewed the reports for Claimant's 2010 MRIs and took Claimant's medical history during Claimant's July 2015 visit. (R.R. at 56a, 67a.) More importantly, however, Dr. Williams' office treated Claimant for lower back problems in 2011. (R.R. at 65a-66a.) Dr. Williams testified that after he treated Claimant in 2011, Claimant's back problems had resolved, and Claimant did not require any further treatment for his back or experience any significant symptoms until his subsequent December 2014 work injury. (R.R. at 66a-67a, 70a.) There is nothing in the record to dispute the fact that Claimant did not receive treatment for his back during the time period between when he treated with Dr. Williams in 2011 and his December 2014 work injury. While Employer impugns Dr. Williams for allegedly lacking knowledge of a separate work-related back injury that Claimant sustained in 2002, this is negated by the fact that Dr. Williams treated Claimant for back problems in 2011, understood the nature of these back problems and successfully treated them, and that Claimant did not receive further treatment until his December 2014 work-related injury.

Dr. Williams did testify that the only back problems Claimant experienced before the December 2014 work injury were the "general low back pain problems that people have." (R.R. at 67a.) However, this statement is not necessarily inaccurate when viewed in relation to Dr. Williams' further testimony that Claimant had complained of lower back pain in the past and had received an MRI for his back before the work injury, but did not receive any treatment for his back from 2011 until 2014. (R.R. at 65a-67a, 70a.)

Dr. Williams' knowledge of Claimant's prior medical history is comparable to *Pryor* and *American Contracting Enterprises*, where the petitioners alleged the medical experts' testimony was incompetent for lacking a full

19

understanding of the claimants' prior injuries. Like here, in *Pryor* the claimant argued that the employer's medical expert was incompetent because he did not have a complete understanding of the claimant's medical history. 923 A.2d at 1203. However, we concluded that because the medical expert testified he was generally aware of the claimant's prior back injuries and had reviewed the claimant's medical records, his testimony provided competent evidence upon which the WCJ could base his findings. Similarly, in *American Contracting Enterprises*, the employer argued that the testimony of one of the claimant's medical experts was incompetent because the medical expert had a significantly inaccurate history of the claimant's prior medical condition. 789 A.2d at 395. In particular, the employer argued that the medical expert's testimony was incompetent because he was unaware that the claimant had received two prior surgical procedures and responded on cross-examination that he did not know whether the pain the claimant experienced in his work injury was a recurrence of his preexisting shoulder problems. *Id.* at 396.

We determined that the medical expert's testimony was not based on inaccurate information. *Id.* Although the medical expert was unaware of the claimant's two previous surgical procedures, we concluded his medical opinion was competent because it was based on his own examination and treatment of the claimant, MRI tests, medical records from the emergency room, and the claimant's history of the work injuries. We explained that none of the records upon which the medical expert relied were proven to be inaccurate and that the medical expert's testimony that he did not know whether the claimant's pain from the work injury was a recurrence of his prior shoulder injuries did not damage or invalidate his testimony because a work-related aggravation of a prior condition is compensable. *Id.*

*Pryor* and *American Contracting Enterprises* are directly on point with the facts in the instant case. Here, because Dr. Williams possessed knowledge, albeit not complete knowledge, of Claimant's earlier back problems due to treating Claimant

20

in 2011 and taking Claimant's medical history at a July 2015 visit, and because Claimant, by all indications, did not experience any significant back problems from 2011 until 2014, Dr. Williams' opinion that Claimant's December 2014 work injury caused the condition requiring surgery was not based solely on inaccurate information. Therefore, we conclude that Dr. Williams' testimony was competent.

Since Dr. Williams' testimony was not based solely on inaccurate information, Employer's claim that Dr. Williams' testimony was incompetent because he did not possess or did not review all of Claimant's "medical records goes to the weight given the expert's testimony, not its competency." *Calex, Inc.*, 968 A.2d at 827; *Degraw*, 926 A.2d at 1001-02 & n.4. Thus, Employer merely seeks to have us reweigh the evidentiary determinations made by the WCJ, which we may not do because such determinations are within the exclusive province of the WCJ as fact-finder and are not subject to review on appeal. *Cerro Metal Products*, 855 A.2d at 937.

### Conclusion

Because the testimony of Claimant's medical expert was competent as a matter of law, we affirm the Board's order.

_____
PATRICIA A. McCULLOUGH, Judge

21

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pocono Medical Center and
Qual-Lynx, Inc.,
                  Petitioners

               v.

Workers' Compensation Appeal
Board (Berry),
                  Respondent

:
:
:
:   No.  698 C.D. 2018
:
:
:
:
:
:

## ***ORDER***

AND NOW, this 9th day of January, 2019, the April 19, 2018 order of the Workers' Compensation Appeal Board is affirmed.

                         _____
                         PATRICIA A. McCULLOUGH, Judge