IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Matt Mariotti,                                  :
                    Petitioner                  :
                                                :   Nos.  1159 & 1160 C.D. 2018
                    v.                          :
                                                :   Submitted:  March 8, 2019
Workers' Compensation Appeal                    :
Board (Ridley Township),                        :
                    Respondent                  :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ELLEN CEISLER, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED:  August 20, 2019


          Matt Mariotti (Claimant) petitions for review of the August 7, 2018 orders of the Workers' Compensation Appeal Board (Board) affirming the decisions of a workers' compensation judge (WCJ), which granted one claim petition and denied a second filed by Claimant against Ridley Township (Employer). Upon review, we affirm.


**Facts and Procedural History**

          Claimant worked for Employer as a sanitation worker.  Claimant alleged he was injured in May 2015 when the sanitation truck he was riding on came to a sudden stop, causing Claimant to swing around and strike the side of the truck (May Injury).  Claimant continued work until October 6, 2015, when he was injured a second

time while grabbing a heavy trash bag while twisting his body (October Injury). Employer issued a notice of temporary compensation payable for the October Injury, but subsequently issued a notice stopping temporary compensation payable and a denial citing Claimant's non-compliance with attendance of medical appointments, missed appointments, failure to reschedule, and inability to be contacted. (Findings of Fact (F.F.) Nos. 1-2, 4-5.)

In July 2016, Claimant filed two claim petitions against Employer. In the first, Claimant alleged that he sustained injuries to his ribs, abdomen, and lower back on September 15, 2015, by twisting his torso to throw a heavy trash bag into a sanitation truck. In the second claim petition, Claimant alleged he sustained injuries to his neck and head on October 6, 2015, when he was standing on the rails of a sanitation truck, which came to a sudden stop causing Claimant to swing around and strike the side of the truck. In this petition, Claimant also alleged that, later in the day, he sustained additional injuries to his arm, shoulder, and back when he was throwing a heavy trash bag overhead. In both petitions, Claimant sought total disability benefits as of October 6, 2015, the date he stopped working. (F.F. Nos. 7, 9; Reproduced Record (R.R.) at 4-12.) [1]

The matter was assigned to a WCJ who held a hearing on August 10, 2016. At the beginning of the hearing, Claimant's counsel informed the WCJ of Claimant's intent to withdraw the first claim petition alleging an injury on September 15, 2015, and to file a new claim petition alleging an injury on May 12, 2015. Thus, Claimant's counsel indicated that the testimony presented at the hearing would pertain to both the

---

[1] Claimant has failed to comply with the Pennsylvania Rule of Appellate Procedure 2173, requiring the pages of the reproduced record to be numbered "in Arabic figures . . . by a small a, thus 1a, 2a, 3a, etc." Pa.R.A.P. 2173.

second pending claim petition alleging the October Injury, as well as the claim petition that he intended to file after the hearing pertaining to the May Injury. (R.R. at 48.)

Claimant testified that he worked for Employer as a part-time sanitation worker. Claimant described three work-related injuries and one non-work-related injury that he experienced during the course of his employment. Regarding the first work-related injury, Claimant testified that on an unspecified date in the Summer or Fall of 2014, he went to pick up a trash can and felt a sharp pain in his lower back. Claimant stated that he told his supervisor, John DePietro, about the incident but was told that an injury would jeopardize his chances of being employed full-time. Claimant acknowledged that he continued working and that no claim petition was submitted for this injury because he could not determine the specific date on which the injury occurred. Claimant testified that, prior to October 2014, he had never had any injuries or symptoms in his lower back or shoulders. (F.F. Nos. 5-6; R.R. at 49-50, 60, 62.)

Claimant described the second work-related injury, the May Injury, as having occurred on May 12, 2015, when the sanitation truck he was riding on came to a sudden stop, causing Claimant to hit the left side of his head and left shoulder on the railing. Claimant testified that he again told Mr. DePietro, who stated that Claimant could not receive workers' compensation because he had waited over 24 hours to report the injury, and that Claimant was only eligible to receive payment for his medical bills because he worked part-time. Claimant indicated that he missed work for approximately eight weeks because of the injury and that he treated with his family doctor, Dr. John Fanning, who ordered x-rays and an electromyogram (EMG) in response to Claimant's complaints of numbness in his fingers and hand. Claimant stated that, although he still had back pain from the first injury and shoulder pain from the second injury, he returned to work and resumed his regular duties in July 2015

3

because he needed the income.[2] Claimant testified that, prior to the May Injury, he never had any injuries, accidents, or symptoms involving dizziness, his vision, or his left shoulder/left side of his head. (F.F. Nos. 6-9; R.R. at 50-54, 62-65.)

Claimant also described a non-work related injury that occurred on September 15, 2015,[3] for which he received treatment in the emergency room, complaining of pain in his ribs, abdomen, back, anxiety, and dizziness. Claimant described the incident as follows:

> I was playing Xbox and I was getting kind of dehydrated, so I went to go stand up and get something to drink, and I was stretching and I felt something in the front of my ribs like pop, and instantly since I was stretching, I had to go to the bathroom. I was throwing up.

(R.R. at 55.) Claimant acknowledged that his counsel had mistakenly indicated that Claimant sustained a work-related rib/abdomen/lower back injury on September 15, 2015, in the first claim petition, but he had subsequently asked that it be withdrawn.[4] (F.F. No. 9; R.R. at 55-56, 71-72.)

With regard to the third work-related injury, the October Injury, Claimant testified that on October 6, 2015, he grabbed a heavy trash bag containing dirt and cinder blocks and, when twisting to throw the bag into the sanitation truck, felt a pop and sharp burning pain in his back. Claimant stated that he informed Mr. DePietro, who took him to the Centers for Occupational Health at Park Care (Park Care) for a

---

[2] With regard to this second injury, Claimant's counsel clarified that he had mistakenly included this incident in the second claim petition, incorrectly indicating that the injury occurred on October 6, 2015, instead of May 12, 2015.

[3] The WCJ described this incident as having occurred on September 23, 2015. (F.F. No. 9.)

[4] Claimant also stated that, prior to his current counsel, he retained an attorney, who filed a claim petition for a September 15, 2015 work injury; however, Claimant stated that "it didn't work out with them [sic]" because Claimant "got the date messed up." (R.R. at 70.)

4

physical examination and drug test, which Claimant passed, after which he was referred to an orthopedics center. Claimant indicated that he was presently receiving treatment from Dr. Marc Persson, who had prescribed him medication, a hard-shell back brace, and physical therapy, and ordered an EMG and MRI. (F.F. Nos. 9-10; R.R. at 54-57.)

Claimant indicated that he had not returned to work since October 6, 2015, because he did not feel capable of doing so. He described his back pain as progressively worsening since that day and stated that he had ongoing shoulder pain, blurry vision, double vision, and migraines from the May Injury. On cross-examination, Claimant acknowledged that he had been non-compliant regarding his medical appointments, stating he was stressed out and depressed about his mother's death and because he did not have a car. When asked, Claimant also admitted that he had lost his license via a legal order but stated it did not have anything to do with his inability to return to work. (F.F. No. 7; R.R. at 54-57, 76-80.)

On August 15, 2016, Claimant filed a claim petition alleging he sustained injuries to his head, neck, and shoulder on May 11, 2015, "while riding on [the] rail of [a] trash truck, [when the] driver stopped suddenly, causing [C]laimant to swing around and strike [the] side of [the] truck." (R.R. at 30.) Thereafter, the WCJ conducted a second hearing on September 14, 2016, at which Claimant and witnesses for Employer testified.

Employer presented the testimony of Mr. DePietro, who had served as Employer's Superintendent of Public Works for eight years. Mr. DePietro denied that Claimant informed him about the May Injury, stating that had Claimant done so, he would have had Claimant fill out an accident report form. Mr. DePietro also denied telling Claimant that getting injured would jeopardize his chance at full-time

5

employment or that Claimant was ineligible to receive workers' compensation benefits because he was only employed part time. (F.F. Nos. 12-13; R.R. at 92-98, 105.)

Mr. DePietro also described an incident that occurred on September 22, 2015, wherein one of the sanitation truck drivers called Mr. DePietro and complained that something appeared to be wrong with Claimant, and Mr. DePietro instructed the driver to bring Claimant to his office. Mr. DePietro stated, "[A]s I spoke to him, he was slurring his words, his eyes were dilated, and he just didn't seem right. Even the words he was speaking, it didn't make sense. So I told him, I wanted to take him over to have a drug test, and he refused." (R.R. at 101.) Mr. DePietro stated that Claimant was then told that he was not permitted to return to work until he passed a drug test. Thereafter, Mr. DePietro stated that Claimant took and passed a drug test and ultimately returned to work on September 29, 2015. Mr. DePietro indicated that Claimant also passed a second drug test he was given after the October Injury. (F.F. No. 15; R.R. at 100-02, 109-15.)

Employer next presented the testimony of Mr. Stephen Smith, Employer's Public Works Foreman and Claimant's supervisor. Mr. Smith stated that he did not recall Claimant notifying him about any work injuries and if Claimant had, Mr. Smith would have told him to fill out an accident report. Mr. Smith testified that he had not heard from Claimant or seen him at work as of October 6, 2015, but noted that Employer did not have any light-duty positions available in the sanitation department. (F.F. No. 16; R.R. at 116-21.)

Employer presented the testimony of Glenn Goodwin, Employer's lead employee in the sanitation department and Claimant's supervisor. Mr. Goodwin testified that Claimant did not tell him about his May Injury and explained that when

6

an employee is injured, he is taken to Park Care, and Mr. Goodwin fills out an accident report. (F.F. No. 17; R.R. at 122-24.)

Claimant also testified at the second hearing. Claimant stated that it was his first time seeing the time cards that were submitted into the record during Mr. DePietro's testimony and that, upon reviewing them, it refreshed his memory regarding the May Injury. Specifically, Claimant clarified that, contrary to his prior testimony, he was now sure that the May Injury occurred on Friday, May 8, 2015, instead of Tuesday, May 12, 2015, and that he informed Employer about it the following Wednesday, on May 13, 2015. Claimant noted that he had always maintained that the May Injury occurred on a Friday. Claimant also asserted that the signature on the form given to all employees upon hiring describing their workers' compensation rights was not his. (F.F. No. 7; R.R at 128-29.)

On cross-examination, Claimant was asked about his failure to attend medical appointments[5] and specifically about his testimony that there was no incident preventing him from returning to work. Claimant acknowledged that he was arrested for driving under the influence (DUI) on October 31, 2015. When asked whether that incident prevented him from getting treatment for his work injuries, Claimant cited being upset and depressed regarding his mother's death on November 13, 2015, as well as his lack of a car, as the reason for his failure to attend appointments. (F.F. No. 11; R.R. at 132-34.)

The WCJ conducted a third hearing on October 12, 2016, at which Employer presented the testimony of Annmarie Nicholas, Employer's benefits administrator and accounts payable/workers' compensation representative. Ms. Nicholas testified that she was not personally aware of whether Claimant sustained a

---

[5] Employer submitted records from Park Care, which documented that Claimant failed to show up for scheduled appointments on October 20, 22, and 27, 2015. (R.R. at 341-43.)

7

work injury in May but stated that Employer had not received any notice or medical bills for the May Injury. With regard to Claimant's eight-week absence, Ms. Nicholas indicated that such an absence was not unusual amongst seasonal workers. As to the October Injury, Ms. Nicholas acknowledged that Claimant provided both verbal and written notice of the injury. Ms. Nicholas stated that she received notices stating that Claimant had missed medical appointments for treatment of the October Injury and, when she attempted to verify with Claimant, she was unable get in contact with him. (F.F. Nos. 18-23; R.R. at 146-70.)

Claimant submitted the deposition testimony of John Filip, M.D., a board-certified physician in internal medicine. Dr. Filip stated that he had spent the majority of his practice in cardiology, but over the last seven years had focused on occupational medicine. Regarding Claimant, Dr. Filip explained that he first began seeing Claimant on January 5, 2016, after Dr. Persson, a chiropractor with whom Dr. Filip works, referred Claimant to him. Dr. Filip stated that he performed a comprehensive evaluation of Claimant by physically examining him and reviewing various medical records, including imaging studies, and created a report with his findings. Dr. Filip diagnosed Claimant with a concussion, post-traumatic encephalopathy syndrome, and occipital neuralgia, related to the May Injury; lumbar spine subluxation syndrome, lumbar disc and facet disease protrusion, thoracic spine subluxation syndrome, dorsal sprain and strain, and cervical and lumbar radiculopathy related to the October Injury; and cervical and lumbar sprain and strain, related to both the May and October Injuries. Dr. Filip observed that Claimant had scoliosis and, although he was unable to determine the onset of the disease, Dr. Filip stated that it may have been aggravated by the October Injury. (F.F. Nos. 24, 33, 35; R.R. at 194-210.)

Dr. Filip testified that Claimant has been, and continued to be, unable to perform his pre-injury job since the October Injury. Dr. Filip stated that Claimant required analgesics, anti-inflammatory medications, and chiropractic treatment. (F.F. No. 36; R.R. at 212-14.)

Employer submitted the deposition testimony of William Spellman, M.D., a board-certified orthopedic surgeon, who prepared a report after performing a physical examination of Claimant on October 13, 2016, and reviewing Claimant's medical records, images from diagnostic studies, and transcripts from Claimant's and Dr. Filip's testimony. Dr. Spellman stated that, during the examination, Claimant reported that he suffered two work injuries on May 11, 2015, the first occurred when the truck he was riding on abruptly braked and the left side of his head struck the handrail. The second occurred later in the day when the trash he was throwing caught on part of the truck, resulting in an injury to his shoulder. Dr. Spellman testified that Claimant "state[d] he did not injure his low back in association with these events." (R.R. at 409.) Dr. Spellman also indicated that Claimant reported injuring himself on October 6, 2015 when lifting a heavy trash bag into the truck and experienced a painful sensation in his low back. When asked about his medical history, Claimant denied receiving treatment for his neck, shoulder, or back prior to the work injuries. At the time of the examination, Claimant described his neck and back pain as "there all day, every day." (R.R. at 410.) On a scale of "zero being no pain and ten being a horrible, skin-searing burn," Claimant rated his low back pain as a six or seven and his neck as never less than four and, every other day, a five or six. *Id.*

Upon examination, Dr. Spellman testified that Claimant's neck and shoulders did not present with asymmetry, atrophy, tenderness, or muscle spasm, which Dr. Spellman indicated was significant because "if [Claimant] still had any physical

9

problem with his neck, there would have been very pronounced changes in his soft tissues," such that "[t]hey would have lost their normal suppleness and elasticity," and "been knotted up, rope-line indurated[,] or hardened." *Id.* Although Claimant alleged he had pain with more than 20 degrees of right/left lateral rotation of his neck, Dr. Spellman stated this would have been "extraordinary," as he had treated patients "with really bad necks [who] end up needing surgery" and who had better ranges of motion, and thus he classified it as "theatrical behavior," or "behavior for which there [was] not a physical basis." (R.R. at 411.) Moreover, Dr. Spellman stated that he observed Claimant "when it wasn't obvious to him that his neck was being examined," and noted that Claimant would "turn his head 50 degrees right or left[,] which is normally what one does to maintain appropriate eye contact." *Id.* Additionally, Dr. Spellman reported that Claimant's reflexes and motor strength in his upper extremities were normal and that tests for problems with his nerves were negative. (F.F. Nos. 37-39.)

Dr. Spellman opined that "nothing was out of kilter" with Claimant's lower back, noting the absence of any discernable scoliosis, lordosis, list, or muscle spasms. Dr. Spellman observed that the soft tissue in Claimant's back was smooth and that he did not have induration trigger points, which Dr. Spellman stated was "impossible" with "[a]n ongoing physical problem with the back of the duration and severity reported by [Claimant]." (R.R. at 411.)

Dr. Spellman stated that Claimant's report of increased low back pain with forward flexion of either shoulder more than 60 degrees was theatrical behavior because "[t]here's no connection between . . . flexing your shoulders to 60 degrees and creating a painful condition or accentuating a painful condition in the low back." *Id.* Based upon an examination of Claimant's neck, upper back, shoulder girdle area, and low back, Dr. Spellman noted two remarkable things: "One is presence of theatrical

10

behavior and fairly extreme theatrical behavior, and the second is the absence of physical findings [that] necessarily have to be present if [Claimant] still had an ongoing problem with those areas." *Id.*

Dr. Spellman testified that he reviewed approximately 2,000 pages of Claimant's medical records, as well as Claimant's and Dr. Filip's testimony. When asked whether he noticed anything that contradicted Claimant's testimony regarding the May Injury, Dr. Spellman referenced two things. Specifically, Dr. Spellman noted that one of Claimant's medical records indicated that he sought treatment from a Dr. Richard Zamarin on May 15, 2015, complaining of neck pain, left shoulder pain, weakness in the left arm, tingling in the left hand, and pain in the right side of the low back, but there was no mention of a work injury. The report further stated that Claimant's "low back problem ha[d] been a recurring issue," but his neck, shoulder, and left arm pain started a week prior "[w]hile dead-lifting [when] he felt something pop in his shoulder." (R.R. at 412.) Dr. Spellman also noted that the emergency report from Claimant's visit to the emergency room at Taylor Hospital on September 23, 2015, indicated that Claimant reported he had "been dealing with low back pain for months," and "ha[d] pain daily." (R.R. at 413.) Ultimately, Dr. Spellman concluded that, based upon Claimant's reasonably contemporaneous medical records around the time of the May Injury, Claimant's neck and left shoulder complaints were related to the weightlifting event documented in the May 15, 2015 report by Dr. Zamarin. (F.F. No. 42.)

However, Dr. Spellman stated that he could not, within a reasonable degree of medical certainty, conclude that Claimant had not suffered a low back injury in October 2015. Dr. Spellman stated that he reviewed a 2016 MRI of Claimant's back and, while he observed "some standard relatively low-grade degenerative stuff," there

11

were no post-traumatic changes to Claimant's back attributable to an injury. (R.R. at 413.) With regard to the scoliosis reported by Dr. Filip, Dr. Spellman stated that "it [was] not discernable on physical examination," just barely discernable on the MRI, and, in any case, was not post-traumatic. *Id.* at 414. Dr. Spellman explained that in order for the scoliosis to be related to a work injury, Claimant would have had to have sustained an injury severe enough to produce a bony alteration to the architecture of his spine; however, Dr. Spellman noted this was not present in Claimant. (F.F. Nos. 43-45; R.R. at 413-14.)

Dr. Spellman clarified, however, that he could understand how Dr. Filip came to the conclusion that the scoliosis and thoracic subluxation syndrome were related to one of the work injuries since Dr. Filip's primary training was in cardiology and a cardiologist "would not have the appropriate perspective for evaluating the diagnostic studies that are within the purview of an orthopedic surgeon." (R.R. at 414.) Dr. Spellman also stated that, as of the time he examined Claimant, he did not have occipital neuralgia, cervical sprain or strain, cervical or lumbar radiculopathy, or neurological problems. Dr. Spellman declined to render an opinion with regard to whether Claimant sustained a concussion or post-traumatic encephalopathy syndrome because he was not an expert in that field. However, Dr. Spellman testified that if Claimant had sustained an injury in October 2015, it would have been a lumbar sprain/strain. Further, Dr. Spellman stated that, based upon his observations of Claimant during the physical examination, as well as a review of Claimant's diagnostic imaging, Claimant did not have a neck, upper back, shoulder girdle, mid-back, low back, upper extremity, or lower extremity problem. Ultimately, Dr. Spellman opined that Claimant had fully recovered, did not require any further treatment or work

12

restrictions, and could return to his job as a sanitation worker. (F.F. No. 42-47; R.R. at 412-15.)

Employer also presented the testimony of Christopher King, Psy.D., a licensed psychologist and neuropsychologist, who evaluated Claimant on October 18, 2016. Dr. King testified that Claimant described his work injuries and, regarding head injury symptoms, reported that he experienced nausea, lightheadedness, blurry vision, and memory loss. Claimant denied any loss of vision, hearing loss, seizures, suicidal ideation, or recent incidents of irritability. However, Claimant reported to Dr. King that he experienced headaches every day, which he rated in severity between 4 and 8 on a scale of 10, as well as dizziness, blurry vision, tiredness, sensitivity to bright lights, balance problems, weakness, though more so on his right side, ringing in his ears, occasional numbness in his left hand, and back and neck pain. Claimant also indicated that he had trouble concentrating, difficulty thinking and remembering things, limited reading skills, depression, anxiety, anger, and rated the severity of his memory problems as 7 on a scale of 10. With the exception of anxiety, Claimant denied experiencing these symptoms prior to the work injuries. However, Claimant reported an incident in fifth grade where he sustained a concussion from hitting his head on a diving board but denied ever being in a motor vehicle accident. (F.F. No. 49; R.R. at 460-63.)

Dr. King had Claimant perform various tests, including a standardized mental status examination, which is a cursory assessment of general cognitive functions, on which he scored in the normal range. Dr. King administered an intellectual function and assessment of academic ability, as well as a few measures of attention, concentration, and processing speed, but determined that Claimant was giving incomplete effort on the tests. Dr. King also concluded that Claimant

13

"performed slowly and suspiciously low with clear evidence of an incomplete effort or intentional errors on parts of a Trial Making Test, which is a neuropsychological test with visual scans and sequences." (F.F. No. 54.) Additionally, although Claimant's scores on the Beck Depression Inventory and Beck Anxiety Inventory tests indicated severe depressive and anxiety symptoms, Dr. King found that Claimant's scores were inconsistent with his otherwise normal presentation and more likely reflected symptom magnification in an effort to support Claimant's claims of persisting dysfunction. (F.F. Nos. 51-54; R.R. at 464-66, 494-95.)

Based upon his evaluation of Claimant, as well as a review of Claimant's medical records and the transcript of the testimony and depositions in the case, Dr. King concluded that Claimant's mental status was normal, that there was no evidence of any legitimate neuropsychological or cognitive impairment substantiating Claimant's subjective complaints, and that there was clear evidence of Claimant's incomplete effort and malingering memory deficits in performing the validity tests. Dr. King opined that there was no indication of any acquired psychological or psychiatric disorder and no indication of any mental health treatment or psychotropic medication that could be related to Claimant's May Injury. In this way, Dr. King disagreed with Dr. Filip's diagnosis of a concussion with post-traumatic encephalopathy syndrome resulting from the May Injury. Dr. King specifically noted that Claimant did not report any referable cognitive or neuropsychological symptoms or work injury during his medical appointments around the time of the May Injury in May 2015. Further, Dr. King noted that Claimant reported feeling "all better," (R.R. at 466), during a follow up visit with Dr. Fanning on July 7, 2015, and that there was no mention of a work injury, only mention of a weightlifting injury. (F.F. Nos. 55-59; R.R. 465-69.)

14

On this point, Dr. King explained that a concussion is an alteration in mental status followed by any number of complaints of non-specific symptoms, which are immediate in the aftermath of the concussion but spontaneously resolve over time. Depending on the severity of the symptoms, Dr. King stated that concussion symptoms may last anywhere from a day or two after the injury up to a couple of weeks, but Dr. King stated it was improbable to continue to experiencing residual post-concussive impairments or deficits a year after the injury, as Dr. Filip contended was the case with Claimant. (F.F. Nos. 55, 58; R.R. at 467-68.)

Dr. King emphasized that the results of a CT scan of Claimant's head taken in February 2016, taken in response to Claimant's non-specific symptoms, were normal and showed no evidence of brain damage. A subsequent CT scan was ordered for Claimant in July 2016, due to Claimant's complaints of syncope and headaches, but the results, consistent with the earlier study, were normal and unremarkable. Dr. King noted that Claimant reported being stabbed several times during an incident in 2014 and required 143 staples to close his wounds, as well as three to four months to heal. As a result of the stabbing, Claimant was taking three to four Percocet a day but was later placed on Suboxone to treat his withdrawal symptoms. Dr. King agreed with a notation in Claimant's medical records that his complaints of dizziness and other subjective symptoms such as poor balance and sensory motor deficits could be attributed to the Suboxone medication. (F.F. No. 58; R.R. at 467-69.)

On cross-examination, however, Dr. King acknowledged that various factors in Claimant's life including the loss of his mother, that he had no income, and the fact that he was involved in litigation could have contributed to Claimant's report of severe depression and anxiety symptoms. Dr. King also acknowledged that he did not have any of Claimant's medical records related to what Claimant's counsel

15

classified as "the 2009 motor vehicle accident [that] only resulted in an injured elbow." (R.R. at 474.)

Ultimately, the WCJ made the following findings with regard to the credibility of Claimant and the medical witnesses:

> The Claimant is credible to an extent, particularly with respect to the occurrence of the work injury on October 6, 2015, on the basis of his demeanor during his testimony at hearings before the judge. Drs. Spellman and King are more credible and persuasive than Dr. Filip for several reasons, to wit: 1.) Dr. Spellman, as a board certified orthopedic surgeon, has better credentials for the determination of the existence of the alleged orthopedic type of conditions as those of the Claimant and of recovery from them than Dr. Filip, with a board certification in internal medicine; 2.) Dr. King, as a psychologist/neuropsychologist, has better credentials for the determination of the existence of the alleged mental conditions as those of the Claimant than Dr. Filip, with a board certification in internal medicine and no described expertise in mental conditions; 3.) Dr. Spellman did a more comprehensive overall examination of the Claimant with a myriad of tests than Dr. Filip, without performance of all of the same tests as those by Dr. Spellman during Dr. Filip's examination of the Claimant; 4.) Dr. King did a more comprehensive evaluation of the Claimant with a myriad of tests than Dr. Filip, without the performance of the same tests as those by Dr. King during Dr. Filip's examination of the Claimant; 5.) Dr. Filip's designation of the Claimant's alleged injuries isn't supported by the Claimant's description of them; 6.) Dr. Filip's description of the Claimant's work injury isn't entirely buttressed by the Claimant's description of it; 7.) Drs. Spellman and King gave rational explanations for their opinions, particularly of those in repudiation of Dr. Filip's opinions, on the basis of the clinical results of their evaluations of the Claimant and the results of the diagnostic tests; 8.) Dr. Filip didn't specify the clinical components of each of his diagnoses of the Claimant and the mechanism of the injury for the production of each of those diagnosed conditions; and 9.) The statements in the

16

reviewed medical records support the opinions of Drs. Spellman and King.

(F.F. No. 3.) Based upon these findings, the WCJ found that Claimant sustained his burden with regard to the October Injury and granted him total disability benefits for the period from October 7, 2015, through October 12, 2016. However, the WCJ determined that Claimant did not sustain his burden with respect to the May Injury, and denied and dismissed the claim petition pertaining to that injury.[6] Claimant appealed the decision and order of the WCJ to the Board. On August 7, 2018, the Board affirmed the WCJ's decision and order. Claimant filed a petition for review in this Court to which Employer filed a motion to quash, asserting that Claimant failed to preserve three of the four issues he was raising on appeal. By order dated October 11, 2018, we denied the motion to quash but noted that the parties could address issue of waiver in their briefs on the merits.

## Discussion

Claimant now petitions this Court for review of the Board's order,[7] raising the following issues: (1) whether the Board erred in conducting a substantial evidence analysis of the WCJ's opinion and thereby failing to recognize that the WCJ's conclusions could not have been reached on the basis of only substantial, competent,

---

[6] The WCJ issued two separate but identical decisions and orders disposing of both claim petitions, as did the Board. Claimant likewise filed two separate but identical petitions for review. On October 16, 2018, this Court consolidated the two matters.

[7] Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer)*, 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

relevant, and admissible evidence; (2) whether the Board failed to recognize that Employer's medical evidence was "incompetent, equivocal, based on uncorroborated [h]earsay, and otherwise insufficient to support the WCJ's conclusions"; and (3) whether the Board's "cursory review failed to detect that the WCJ's Decision was not supported by substantial, competent evidence[,] was contrary to and/or capriciously disregarded the evidence which was competent[,] and based on improper/inadequate credibility determinations."[8]  (Claimant's Br. at 2.)

Claimant first asserts that the record was both inadvertently and intentionally tainted by irrelevant and misleading evidence, which led the WCJ to reach conclusions that could not have otherwise been reached had that evidence not entered the record.  Claimant specifically cites the initial confusion around the dates of the work injuries and argues that Employer "capitalized" on the confusion by questioning Claimant about his September non-work related injury.  (Claimant's Br. at 19.)

Claimant also complains that the testimony from Mr. Smith and Mr. Goodman was presented "solely to enhance the credibility of [Mr.] D[e]Pietro, based on the sheer number of witnesses denying [that C]laimant reported any injury to them," and Ms. Nicholas's testimony was, among other things, "a rouse, to detract from relevant issues, and have the [WCJ] focus on [C]laimant's demeanor and responses, during his refutation of irrelevant, unnecessary evidence," and "presented to solely, and unambiguously plant the seeds of doubt."  (Claimant's Br. at 19-20.)

Relatedly, Claimant argues that the evidence of Employer's drug and alcohol policy, Claimant's taking and passing two drug tests, and the question about whether his DUI "affect[ed his] ability to attend therapy appointment" was another "wholly irrelevant line of questioning, designed to attack [C]laimant's credibility by

---

[8] Claimant also listed a fourth issue:  "What is the appropriate Remedy?"  (Claimant's Br. at 2.)

18

insinuation[,] in direct conflict with the actual evidence." (Claimant's Br. at 20) (emphasis omitted). Claimant asserts that he admitted missing appointments and, thus, the questioning of Claimant about the DUI and other reasons for his missed appointments was unnecessary. Claimant further argues that, given the volume of the "confusing, misleading, irrelevant, and even blatantly inadmissible evidence," it cannot be "realistically argued" that the "improper" evidence had no impact on the WCJ's conclusions. (Claimant's Br. at 17.)

Claimant, however, has failed to support this argument by identifying where in the record objections were lodged against this evidence, such that the WCJ could have issued a ruling as to its relevancy. *See* Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears.") Indeed, Claimant appears to acknowledge that his objection to this evidence is in retrospect, asserting, in a novel argument, that the WCJ or Board should have, "with the benefit of hindsight," made note of the "purpose" behind Employer's decision to present its witnesses. (Claimant's Br. at 21.) Notably, however, within the same argument, Claimant faults the WCJ for permitting Employer to present the "irrelevant, unnecessary evidence" of its witnesses, while simultaneously criticizing the WCJ for failing to make an assessment of, or to "make note of the purpose" for, their testimony. *Id.* at 20, 21. Claimant cites to no legal authority for the notion that WCJs or the Board must identify the "purpose" for witnesses' testimony. Furthermore, even if objections to this testimony were properly placed on the record,

19

Claimant's arguments amount to little more than mere disagreement with Employer's litigation strategy, which does not constitute reversible error. [9]

Further, the WCJ's failure to make findings of credibility regarding what Claimant deems the "irrelevant" testimony of three fact witnesses was not reversible error. Section 422(a) of the Workers' Compensation Act[10] requires a WCJ to issue a "reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." 77 P.S. §834. A decision is reasoned "if it allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. 2003). Here, the WCJ's decision adequately explained her reasoning in reaching her conclusions, which turned primarily on medical testimony. Thus, the WCJ's failure to issue specific findings as to the credibility of Mr. Smith, Mr. Goodman, and Ms. Nicholas does not impair our ability to perform our appellate function.

Next, Claimant argues that the medical testimony of Dr. Spellman and Dr. King "should [have] be[en] rejected as incompetent." (Claimant's Br. at 23.) With

---

[9] As to the questioning about Claimant's DUI, we note that while Claimant did object on the record, Employer explained that the questioning was relevant because it pertained to Claimant's testimony that "there was no incident that prevented [him] from coming back to work." R.R. at 132. The WCJ agreed with Employer, stating that such questioning was "innocuous," after which Claimant acknowledged that the loss of his driver's license as a result of the DUI contributed to his failure to attend medical appointments. (R.R. at 133.) Given that workers' compensation hearings are "a liberal information gathering process that favors admitting all evidence into the record but to not allow arbitrary disregard of the rules of evidence," we discern no error. *USX Corp. v. Workers' Compensation Appeal Board (Labash)*, 788 A.2d 1101, 1106 (Pa. Cmwlth. 2001).

[10] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §834.

20

regard to Dr. Spellman, Claimant's primary argument revolves around the May 15, 2015 note from Dr. Richard Zamarin of Premier Orthopaedics on which Dr. Spellman, according to Claimant, based the entirety of his medical opinion. Noting that the WCJ ultimately did not allow the report into evidence, Claimant cites *City of Philadelphia v. Workers' Compensation Board of Review (Kriebel)*, 29 A.3d 762 (Pa. Cmwlth. 2011), and asserts that the statements contained in it were hearsay and not corroborated by any other source. Claimant argues that Dr. Spellman relied "entirely on a single, uncorroborated statement" in the "[h]earsay report"—namely that Claimant's neck and shoulder symptoms resulted from a weightlifting injury he reported to Dr. Zamarin— and therefore Dr. Spellman's opinion was "legally insufficient" and unable to support any finding of fact. (Claimant's Br. at 24.)

Claimant also asserts that the WCJ erred in denying benefits for the May Injury, citing the WCJ's finding that Claimant's testimony was "credible to an extent," particularly regarding the October Injury, (F.F. No. 3); Dr. Filip's "uncontroverted" testimony as to the existence of Claimant's concussion, (Claimant's Br. at 31); and Dr. King's testimony that if Claimant's subjective complaints were to be believed, they were consistent with a concussion. Based on these points, Claimant asserts that the existence of a concussion was uncontroverted for at least some period of time and, accordingly, the WCJ capriciously disregarded this unrebutted evidence in declining to find Claimant met his burden of proof with regards to the May Injury.

In response, Employer asserts that Claimant waived any argument regarding the note from Dr. Zamarin by failing to object to the document during the deposition and by failing to submit written objections prior to the close of the record. Additionally, citing *Empire Steel Castings, Inc. v. Workers' Compensation Appeal Board (Cruceta)*, 749 A.2d 1021 (Pa. Cmwlth. 2000), Employer notes that there is an

21

exception to the hearsay rule where medical witnesses express opinions based upon medical records documented by other doctors, even if the records themselves are not submitted into evidence, so long as the records are the kind upon which the medical profession customarily relies. Here, Employer observes that both Dr. Spellman and Dr. King stated that they reviewed Claimant's medical records in connection with their evaluations, including records from Dr. Zamarin, and both testified that such records were of the type they would customarily review and rely upon in rendering opinions and diagnosing patients. Finally, Employer observes that the WCJ provided "nine different explanations to support her credibility determinations," and specified why she found Dr. Spellman and Dr. King to be more credible than Dr. Filip. (Employer's Br. at 12.)

"[I]t is a fundamental tenet of workers' compensation law that the WCJ, as fact-finder, has complete authority over questions of witness credibility and evidentiary weight." *Verizon Pennsylvania Inc. v. Workers' Compensation Appeal Board (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015). Further, "[f]or purposes of appellate review, it is irrelevant whether there is evidence to support contrary findings; if substantial evidence supports the WCJ's necessary findings, those findings will not be disturbed on appeal."[11] *Id.* Therefore, "[a]s the ultimate fact-finder, the WCJ has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part." *Id.* A court is only permitted to overturn a credibility determination "if it is

---

[11] "Substantial evidence is such relevant evidence a reasonable person might find sufficient to support the WCJ's findings." *Verizon Pennsylvania, Inc.*, 116 A.3d at 1162 n.4. To determine if a "finding of fact is supported by substantial evidence, this Court must consider the evidence as a whole, view the evidence in a light most favorable to the party who prevailed before the WCJ, and draw all reasonable inferences which are deducible from the evidence in favor of the prevailing party." *Id.*

arbitrary and capricious or so fundamentally dependent on a misapprehension of facts, or so otherwise flawed, as to render it irrational." *Id.*

Although the WCJ has exclusive province over questions of credibility and evidentiary weight, "the question of the competency of the evidence is one of law and fully subject to our review." *Cerro Metal Products Co. v. Workers' Compensation Appeal Board (Plewa)*, 855 A.2d 932, 937 (Pa. Cmwlth. 2004). It is well-established that "[c]ompetency when applied to medical evidence, is merely a question of whether the [witness's] opinion is sufficiently definite and unequivocal to render it admissible." *Id.* "[M]edical evidence is unequivocal as long as the medical expert, after providing a foundation, testifies that in his professional opinion he believes or thinks the facts exist." *Id.*

Here, Claimant's arguments regarding Dr. Spellman and Dr. King amount to little more than disagreement with the WCJ's credibility determinations. The WCJ specifically stated the reasons why she credited the testimony of Dr. Spellman and Dr. King over that of Dr. Filip, including the following: Dr. Spellman and Dr. King had better credentials in their respective fields, performed more comprehensive evaluations of Claimant, and gave more rational explanations for their opinions than Dr. Filip. (F.F. No. 3.)

With regard to the note from Dr. Zamarin, "it has long been held as an exception to the hearsay rule that a medical witness may express an opinion based upon medical records of others even if those records were not introduced into evidence so long as they are the kind of records upon which the medical profession customarily relies in the practice of their profession." *Empire Steel Castings, Inc.*, 749 A.2d at 1026; *see also* Pa.R.E. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the

23

particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

However, in *City of Philadelphia*, our Supreme Court clarified that "an expert's opinion does not constitute substantial competent evidence where it is based on a series of assumptions that lack the necessary factual predicate." 29 A.3d at 764. There, the employer presented testimony from a medical doctor who did not evaluate the decedent, a firefighter, but instead based his opinion on a review of medical records and testimony. *Id.* at 765-66. Based solely upon an uncorroborated 40-year-old note in the claimant's military medical records, the doctor concluded that the cause of the claimant's disease was intravenous drug use. *Id.* On appeal, the Supreme Court held that the doctor's opinion was legally insufficient to overcome a statutory presumption that the disease was causally related to work because his conclusion was based upon a series of unsubstantiated assumptions. *Id.* at 770-71.

Unlike in *City of Philadelphia*, here, Dr. Spellman based his opinion on the history Claimant provided, a review of the medical records and diagnostic studies, and a comprehensive physical examination of Claimant. More specifically, Dr. Spellman's conclusion that Claimant's neck and shoulder symptoms, if any, did not result from a work injury was not based on a series of unsubstantiated assumptions, but rather on facts supported by the record, including Claimant's "reasonably contemporaneous medical records near the time of the [May I]njury." (F.F. No. 42.) Therefore, Dr. Spellman's consideration of the note and reliance on it in the context of Claimant's other "reasonably contemporaneous medical records" around the time of the May Injury, in conjunction with his examination of Claimant, does not render his medical opinion legally insufficient. *Id.*

24

As to the WCJ's determination that Claimant failed to meet his burden regarding the May Injury, we find no error. Contrary to Claimant's contention that the testimony regarding his concussion was unrebutted, Dr. King expressed his disagreement with Dr. Filip's opinion that Claimant sustained a concussion in May 2015, stating that there was "no clear evidence of any diagnosable concussion at that time." (R.R. at 468-69.) It is therefore apparent that there was conflicting evidence on the issue of whether Claimant sustained a concussion in May 2015, and the WCJ, as the fact finder, reviewed the evidence and credited the testimony of Dr. King over that of Dr. Filip. In reaching this conclusion, the WCJ observed that "[t]he statements in the reviewed medical records support[ed] the opinions of Drs. Spellman and King." (F.F. No. 3.)

As we have stated before, the fact that there is contrary medical evidence in the record simply does not equate to there being a lack of substantial evidence supporting the WCJ's findings. *Empire Steel Castings, Inc.*, 749 A.2d at 1024 ("[I]t does not matter that there is evidence in the record which supports a factual finding contrary to that made by the WCJ, rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding. It is solely for the WCJ, as the factfinder, to assess credibility and to resolve conflicts in the evidence." (internal citations omitted)). Here, the WCJ assessed the credibility of the witnesses and resolved the conflicts in the evidence for Employer. We discern no error or abuse of discretion.

Accordingly, for all the reasons set forth above, the orders of the Board are affirmed.

25

_____

PATRICIA A. McCULLOUGH, Judge


Judge Fizzano Cannon did not participate in this decision.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Matt Mariotti,                :
           Petitioner        :
                               :    Nos. 1159 & 1160 C.D. 2018
           v.                :
                               :
Workers' Compensation Appeal    :
Board (Ridley Township),          :
                    Respondent     :

## ***ORDER***

AND NOW, this 20th day of August, 2019, the orders of the Workers' Compensation Appeal Board, dated August 7, 2018, are hereby affirmed.

_____

PATRICIA A. McCULLOUGH, Judge